1  **BOTTINI & BOTTINI, INC.**
Francis A. Bottini, Jr. (SBN 175783)
2  Albert Y. Chang (SBN 296065)
Anne Beste (SBN 326881)
3  7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
4  Telephone: (858) 914-2001
Facsimile:   (858) 914-2002
5
6  *Attorneys for Plaintiff Becky Kiger*
7
8
                        **UNITED STATES DISTRICT COURT**
9                       **SOUTHERN DISTRICT OF CALIFORNIA**
10

11  BECKY KIGER, derivatively on          Case No. **'20 CV 1355 LAB MDD**
behalf of QUALCOMM
12  INCORPORATED,
                                          **VERIFIED SHAREHOLDER**
13                           Plaintiff,   **DERIVATIVE COMPLAINT FOR:**
                                          1. **BREACH OF FIDUCIARY**
14           vs.                             **DUTY;**
15  STEVE MOLLENKOPF, MARK D.             2. **AIDING AND ABETTING**
MCLAUGHLIN, MARK FIELDS,                  **BREACH OF FIDUCIARY**
16  BARBARA T. ALEXANDER,                    **DUTY;**
17  FRANCISCO ROS, JEFFREY W.             3. **ABUSE OF CONTROL;**
HENDERSON, ANN M.                         4. **UNJUST ENRICHMENT;**
18  LIVERMORE, HARISH MANWANI,               **AND**
19  JAMIE S. MILLER, CLARK T.             5. **VIOLATION OF SECTION**
RANDT, JR., IRENE B. ROSENFELD,             **14(A) OF THE SECURITIES**
20  KORNELIS SMIT, ANTHONY J.              **EXCHANGE ACT OF 1934.**
21  VINCIQUERRA, and DOES 1–30,
22                          Defendants,   **DEMAND FOR JURY TRIAL**
23
24           – and –
25  QUALCOMM INCORPORATED,
26                   Nominal Defendant.
27
28

SHAREHOLDER DERIVATIVE COMPLAINT

# Table of Contents

I.  INTRODUCTION ........................................................................................1

II.  NATURE AND SUMMARY OF THE ACTION .....................................6

III.  JURISDICTION AND VENUE ................................................................14

IV.  THE PARTIES .........................................................................................15

   A.  Plaintiff.........................................................................................15

   B.  Nominal Defendant .......................................................................15

   C.  Executive Officer Defendant.........................................................15

   D.  Director Defendants.......................................................................15

   E.  Doe Defendants ............................................................................17

   F.  Unnamed Participants....................................................................18

V.  RESPONSIBILITIES AND DUTIES OF THE INDIVIDUAL
     DEFENDANTS.........................................................................................18

   A.  Responsibilities of the Individual Defendants .............................18

   B.  Fiduciary Duties of the Individual Defendants............................20

   C.  Breaches of Fiduciary Duties by the Individual Defendants.....21

   D.  Conspiracy, Aiding and Abetting, and Concerted Action ........21

   E.  The Directors' Roles and Committees at Qualcomm .................23

VI.  SUBSTANTIVE ALLEGATIONS ...........................................................24

   A.  Qualcomm Has Repeatedly Falsely Represented That It
        Has Made Substantial Progress Towards Diversity and
        Inclusion in Its Workplace and on the Board...............................25

i

B.     The Compensation Committee at Qualcomm is
       Responsible for the Company's Diversity and Inclusion
       Efforts ........................................................................................28

C.     The Governance Committee is Responsible for
       Nominating Individuals to the Company's Board ....................28

D.     At All Relevant Times, the Individual Defendants Have
       Had Actual Knowledge That, Contrary to Its Public
       Statements, Qualcomm Was Not Achieving Success With
       Respect to Its Diversity and Inclusion Initiatives and That
       Such Efforts Were Not Having a "Tangible Effect" on the
       Lack of Diversity at Qualcomm ........................................................30

E.     False and Misleading 2019 and 2020 Proxy Statements
       Approved by the Director Defendants ..........................................31

F.     Qualcomm's Governance Committee Members Have
       Repeatedly Breached Their Fiduciary Duties to Ensure
       Diversity on the Board......................................................................45

G.     The Director Defendants Breached Their Duties of Loyalty
       and Good Faith by Failing to Ensure the Company's
       Compliance with Federal and State Laws Regarding
       Diversity and Anti-Discrimination..................................................51

H.     The Director Defendants Have Breached Their Duties by
       Continually Re-Hiring PriceWaterhouseCoopers LLP as
       the Company's Auditor, Despite Its Failure to Do Its Job .........53

I.     The Unjust Compensation Awarded to Defendant
       Mollenkopf ......................................................................................54

VII.   THE COMPANY HAS SUFFERED SIGNIFICANT DAMAGES ........56

VIII.  DEMAND FUTILITY .................................................................57

A.     Demand on the Board is Excused as Futile .................................58

ii

B.    Demand Is Excused Because a Majority of the Director Defendants is Either Not Independent or is Conflicted Because These Defendants Face a Substantial Likelihood of Liability Arising From Their Misconduct ...............................60

C.    The Entire Board Faces a Substantial Likelihood of Liability for Failure to Discharge Their Oversight Obligations in Good Faith ..............................................................62

IX.    CAUSES OF ACTION .................................................................63

X.    PRAYER FOR RELIEF ..............................................................70

iii

Plaintiff Becky Kiger ("Plaintiff") submits this Verified Shareholder Derivative Complaint against certain directors and officers of nominal defendants Qualcomm Incorporated ("Qualcomm" or the "Company") for, *inter alia*, violations of the Securities Exchange Act of 1934 ("Exchange Act") and breaches of fiduciary duties.  In support of these claims, Plaintiff alleges the following upon (1) personal knowledge with respect to the matters pertaining to herself; and (2) information and belief with respect to all other matters, based upon the investigations undertaken by her counsel, which include a review of Qualcomm's legal and regulatory filings, press releases, analyst reports, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

# I.   INTRODUCTION

"We are a country suffering from racial inequality. And we want the inequality and suffering to end.  Enough people agree with these points that this issue has become a matter that will impact every corporation doing business in this country. Companies that are capable of understanding their roles in taking effective action to end inequality will benefit operationally and reputationally; those that refuse to acknowledge their exposure to this massive problem or that are incapable of swift and effective action will struggle to maintain their competitive positions as employers and with consumers."[1]

---

[1] *See* John Streur, "More engagement needed to get companies to address racial inequality risks and issues," Calvert Research and Management, June 19, 2020, available at https://www.calvert.com/impact.php?post=more-engagement-needed-to-get-companies-to-address-racial-inequality-risks-and-issues-&sku=35910, last visited June 29, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

"Diversity shouldn't be encouraged, it should be demanded as a critical business imperative."[2]

1. Despite the statement of Qualcomm's Chief Diversity Officer that diversity and inclusion "should be demanded," Qualcomm has failed to create any diversity at the very top of the Company — the Board of Directors (the "Board"). The Qualcomm Board has lacked diversity at all relevant times, and is one of the few remaining publicly-traded companies without a single African American director.

2. Back in the 1960s, almost every corporate board looked like the following:



Board of directors attend a meeting in 1960. CENTRAL PRESS GETTY.

---

[2] Vicki Mealer-Burke, Qualcomm's Chief Diversity Officer.  *See* Diana Goovaerts, "Q&A: Qualcomm pushes diversity for business boost," Mobile World Live, Mar. 12, 2020, available at https://www.mobileworldlive.com/featured-content/top-three/qa-qualcomm-pushes-diversity-for-business-boost/, last visited July 3, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

3.     While most of corporate America has made substantial progress in diversification since the 1960s, Qualcomm still does not have a single African American on its Board.   The following are the current members of the Board:

**Mark D. McLaughlin**
Chairman of the Board of Directors

**Mark Fields**
Member of Audit Committee, Director

**Jeffrey W. Henderson**
Chair of Audit Committee, Director





**Ann M. Livermore**
Member of Governance Committee, Director

**Harish Manwani**
Member of HR and Compensation Committee, Director

**Jamie S. Miller**
Member of Audit Committee, Director





SHAREHOLDER DERIVATIVE COMPLAINT

**Clark T. Randt, Jr.**
Chair of Governance
Committee,
Director

**Irene B. Rosenfeld**
Chair of HR and
Compensation
Committee,
Director

**Kornelis Smit**
Member of Governance
Committee & HR and
Compensation
Committee,
Director





**Anthony J. Vinciquerra**
Member of Audit
Committee,
Director



4.     At Qualcomm, it is not just the Board that lacks any African American individuals; there are no African Americans among the Company's executive officers:

SHAREHOLDER DERIVATIVE COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Steve Mollenkopf**
Chief Executive Officer,
Qualcomm
Incorporated

**Cristiano R. Amon**
President, Qualcomm
Incorporated

**Brian Modoff**
Executive Vice
President, Strategy and
M&A, Qualcomm
Incorporated

  

**Akash Palkhiwala**
Executive Vice
President & Chief
Financial Officer,
Qualcomm
Incorporated

**Alex Rogers**
Executive Vice
President and President
Qualcomm Technology
Licensing

**Donald J. Rosenberg**
Executive Vice
President, General
Counsel and Corporate
Secretary

  

5

**Heather Ace**
Executive Vice
President, Human
Resources, Qualcomm
Incorporated

**James H. Thompson**
Executive Vice
President, Engineering
Qualcomm
Technologies, Inc. &
Chief Technology
Officer





## II.   NATURE AND SUMMARY OF THE ACTION

5.    Qualcomm's Directors, wishing to avoid public backlash, have repeatedly made misrepresentations in the Company's public statements by claiming to have a policy of "demanding" diversity and inclusion at the Company.

6.    In reality, though, Qualcomm's Board and senior executive officers remain devoid of Blacks and other minorities.

7.    Even Qualcomm's Chief Diversity Officer, Vicki Mealer-Burke, is white:



6

SHAREHOLDER DERIVATIVE COMPLAINT

8.     Ms. Mealer-Burke, like her employer Qualcomm, likes to offer platitudes as a way of trying to create a veneer of "commitment" to diversity:

> "I recently heard a great way to sum it up: the idea you don't have is from the voice you haven't heard."[3]

9.     This quote sounds clever, but rings hollow at Qualcomm:   the voices with new ideas remain unheard since the Company's workforce and Board remain conspicuously devoid of any meaningful percentage of Black and minority individuals.

10.     ***At Qualcomm, only 1.5% of the workforce is comprised of African Americans***, despite the fact that African Americans make up over 13% of the U.S. population:

|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| ***Black/African American*** | ***1.5%*** | ***1.4%*** | ***1.5%*** |

11.     Moreover, as the chart above demonstrates, Qualcomm has made no progress in increasing the hiring of African Americans since 2017 – the percentage has remained flatlined at 1.5%, after dipping to 1.4% in 2018.

12.     Qualcomm has three times more Hispanic than Black workers, which comprise 4.6% of its workforce.[4]

13.     In reality, Qualcomm has made no real efforts to promote diversity on its Board and among its senior executives.   Indeed, the word "diversity" only appears three (3) times in Qualcomm's 2019 Proxy

---

[3] *Id.*

[4] Source:  Qualcomm 2019 Corporate Sustainability Report, at p. 39.

Statement.

14.    Qualcomm was recently called out for being among the 20 largest companies in the United States without a single Black individual on its Board.  *See* Kerri Anne Renzulli, "*The 20 Largest U.S. Companies Without a Black Person on Their Board*," NEWSWEEK, June 17, 2020.  "Companies need to be intentional about increasing the diversity of their executive leadership teams," says Crystal Ashby, president and CEO of the Executive Leadership Council, an organization of black senior executives that works to increase inclusivity in business leadership. "The culture of an organization is cultivated by its leaders."  *Id.*

15.    As one individual has aptly stated: "We've seen anemic progress to date but ***this is a watershed moment that must spur private and public boards into accelerated action***," says Janet Foutty, executive chair of the board for Deloitte, which has separately researched board diversity among Fortune 500 companies.[5]

16.    But at Qualcomm, the problem has not just been a lack of diversity, but also discrimination, and the discrimination has not been isolated to that directed towards African Americans.  In July 2016, Qualcomm was forced to pay $19.5 million to settle a class action lawsuit which alleged that Qualcomm systematically discriminated against approximately 3,300 women by paying them less than men holding the same or equivalent positions.  In addition to the monetary relief, the settlement required Qualcomm to institute comprehensive programmatic

---

[5] *See* "Kerri Anne Renzulli, "*The 20 Largest U.S. Companies Without a Black Person on Their Board*," NEWSWEEK, June 17, 2020.

8

1    relief designed to ensure that female employees working, for example, in

2    STEM and related positions, would have access to equal job opportunities at

3    the Company.

4        17.    However, four years after the settlement, in 2020 Qualcomm still

5    received an "F" grade in gender pay equity.  *See* "*Gender Pay Equity Report: F*

6    *Grades for Oracle, Qualcomm, Verizon, AT&T*," DATAQUEST, April 1, 2020.[6]

7        18.    Moreover, despite settling the gender discrimination lawsuit,

8    Qualcomm did not do anything to reform its practices with respect to hiring

9    African Americans or ensuring that they have equal job opportunities.

10   Instead of making necessary changes, Qualcomm just continued to issue

11   platitudes about its supposedly strenuous efforts to increase diversity.

12       19.    Founded in 1985, Qualcomm today in 2020 has: (1) zero African-

13   Americans or other minority representatives on its Board; and (2) zero

14   African-Americans among its senior executive ranks.

15       20.    The Director Defendants named herein all signed each of

16   Qualcomm's annual proxy statements.   With such signatures come an

17   obligation to ensure that the statements in the Proxy were true and accurate,

18   and to correct any misleading statements.  They failed to do so.

19       21.    Qualcomm's Directors have deceived stockholders and the

20   market by claiming to have concrete and specific "inclusion and diversity

21   programs that are measurable and produce actionable tasks."   In doing so,

22   the Directors have breached their duty of candor and have also violated the

23   federal securities laws.    Their conduct has also irreparably harmed

24

25       [6] Available  at  https://www.dqindia.com/gender-pay-equity-report-f-
     grades-oracle-qualcomm-verizon-att-analog-devices/,  last  visited  July  13,
26   2020.

27

28

                                       9

1  Qualcomm.  For those who care about diversity, inclusion, and honesty,
2  those who do not adhere to these principles should be boycotted, especially
3  if the perpetrator is one of the largest and most influential corporations in
4  San Diego.

5      22.   Moreover, greater diversity is in Qualcomm's own interest.
6  Studies show that greater board diversity is associated with increased
7  profits. ***A McKinsey report found that companies with the most ethnically***
8  ***or culturally diverse boards worldwide were 43 percent more likely to***
9  ***experience higher profits***.

10      23.   The shareholder derivative lawsuit has been the only judicial
11  mechanism for shareholders to hold directors accountable for engaging in
12  wrongdoing.  Like the United States Supreme Court, California courts have
13  long recognized that derivative suits play an important role in corporate
14  governance where directors fail to do their jobs:

15          The derivative action is practically the only remedy for
16  calling the management to account for its wrongs against the
        corporation and to obtain restitution. Where a derivative suit is
17  against outsiders for wrongs against the corporation the
        directors can usually be expected to decide impartially on the
18  advisability of suing. But the management cannot be expected to
        sue themselves for their own misdeeds.

19  *Pearce v. Super. Ct.*, 149 Cal. App. 3d 1058, 1065 (1983); *see also Vega v. Jones,*
20  *Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 297 (2004); *accord Kamen v.*
21  *Kemper Fin. Servs.*, 500 U.S. 90, 95 (1991) (quoting *Cohen v. Beneficial Indus.*
22  *Loan Corp.*, 337 U.S. 541, 548 (1949)).  As the California Supreme Court
23  recognized in *Jones v. H. F. Ahmanson & Co.*, where, as here, the company's
24  board and management fail to perform their duties, stockholders have a
25  "right" to bring derivative actions.  *See* 1 Cal. 3d 93, 107 (1969).  The courts
26  of Delaware, Qualcomm's state of incorporation, likewise acknowledge that
27  derivative actions serve an important function: "The machinery of corporate

28

SHAREHOLDER DERIVATIVE COMPLAINT

1   democracy and the derivative suit are potent tools to redress the conduct of
2   a torpid or unfaithful management."   *Aronson v. Lewis*, 473 A.2d 805, 811
3   (Del. 1984), o*verruled in part on other grounds by Brehm v. Eisner*, 746 A.2d 244
4   (Del. 2000).

5       24.   Plaintiff, derivatively on behalf of Qualcomm, seeks the
6   following relief from the Director Defendants:

7           (a)   Qualcomm should fire its Chief Diversity Officer and
8   replace her with a person of color;

9           (b) At least three of Qualcomm's directors should immediately
10  resign prior to the Company's annual meeting which is scheduled for
11  March 2021 and should request that the Company nominate three
12  new persons to serve in their stead, which applicants should include
13  two black persons and one other minority;

14          (c)   All Director Defendants named in this suit should return
15  all their 2020 compensation received from Qualcomm (including any
16  stock grants), and donate the money to an acceptable charity or
17  organization whose efforts include the advancement of blacks and
18  minorities in corporate America;

19          (d)   Qualcomm should agree to publish an annual Diversity
20  Report that contains particularized information about the hiring,
21  advancement, promotion, and pay equity of all minorities at
22  Qualcomm;

23          (e)   Qualcomm should create a $800 million fund to hire
24  blacks and minorities, promote minorities to more management
25  positions at the Company, establish and maintain a mentorship
26  program at Qualcomm for minorities that is committed to providing
27  the skills and mentorship necessary to succeed in corporate America;

28

SHAREHOLDER DERIVATIVE COMPLAINT

(f)    Qualcomm should require annual training of its entire Board and all Section 16 executive officers, which training should at a minimum focus on diversity, affirmative action, anti-discrimination and anti-harassment, and other relevant topics;

(g)    Qualcomm should immediately set specific goals with respect to the number of blacks and minorities to hire at the Company over the next five years, and Qualcomm should adopt a revised executive compensation program that makes 30% of executives' compensation tied to the achievement of the diversity goals; and

(h)    Qualcomm should replace PricewaterhouseCoopers LLP ("PWC") as its auditor.  Qualcomm is one of PWC's significant customers, and PWC has served as Qualcomm's auditor *since the Company was founded in 1985*, giving rise to a cozy and clubby relationship between PWC and Qualcomm which is not conducive to effective auditing.  The Company's compliance with its stated policies concerning the alleged commitment to diversity has been abysmal to the point of being basically non-existent.  The very purpose of an auditor is to assess the Company's internal controls and determine if they are functioning effectively. Rather than doing so, PWC has wrongfully and consistently given Qualcomm's internal controls a clean bill of health and has failed to point out the obvious — that Qualcomm lacks an effective system of internal controls to ensure that the Company is not discriminating against minorities and is complying with its stated goals and initiatives regarding the promotion of diversity and the avoidance of discrimination and harassment.

25.    The Individual Defendants' misconduct has caused severe

SHAREHOLDER DERIVATIVE COMPLAINT

financial and reputational damage to Qualcomm Corporation.

26.   While systematically underpaying minorities and women, Qualcomm's CEO and executives have used the money saved to pay themselves unfathomable amounts.  In 2018, Defendant Mollenkopf ranked #21 on the list of the 100 highest paid CEOs, with total compensation of $19,975,472.[7]   Qualcomm reported this figure in its 2019 Proxy, which stated:

> For fiscal 2018, our last completed fiscal year:
> - the annual compensation of our CEO, as reported in the Summary Compensation Table included on page 54 of this proxy statement, was $19,975,472;
> - the annual total compensation of our median employee was $85,592; and
> - **the resulting ratio was 233 : 1**.[8]

27.   As set forth below, Defendants' conduct constitutes bad faith and disloyal acts, giving rise to claims that fall outside the scope of the business judgment rule and outside of permissible indemnification by Qualcomm.  As a result, all members of the Board face a substantial likelihood of liability and any demand on them to bring this case would be a futile and useless act.

///

///

---

[7]*See* https://www.equilar.com/reports/63-table-highest-paid-ceos-2019-equilar-100.html, last visited July 7, 2020.

[8] *See* Qualcomm 2019 Proxy Statement at p. 56.

SHAREHOLDER DERIVATIVE COMPLAINT

### III.   JURISDICTION AND VENUE

28.   This Court has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1331 because of claims arising under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder.   The Court has exclusive jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. § 78aa.   The Court has jurisdiction over the state-law claims in accordance with 28 U.S.C. § 1367.

29.   This Court also has subject matter jurisdiction over this action under Article III of the U.S. Constitution and 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

30.   This Court has jurisdiction over Defendants.   Each Defendant is either a resident of California or otherwise has sufficient contacts with California in order to render the exercise of jurisdiction by this Court over them permissible under traditional notions of fair play and substantial justice.   Additionally, in connection with the misconduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the national securities markets.   The Court has jurisdiction over Qualcomm because Qualcomm is headquartered in San Diego, California and has substantial business operations in California.

31.   Venue is proper in this District pursuant to Section 27 of the Exchange Act.   Venue is also proper under 28 U.S.C. § 1391(b) because: (a)  Qualcomm maintains its principal place of business in this District; and (b) many of the acts and conduct that constitute the violations of law

14

1   complained of herein, including the preparation and dissemination to the
2   public of materially false and misleading information, occurred in this
3   District.

4   **IV.   THE PARTIES**

5       **A.   Plaintiff**

6       32.   Plaintiff Becky Kiger is a current shareholder of Qualcomm, and
7   has continuously held Qualcomm stock at all relevant times.  Plaintiff is a
8   citizen of Kansas.

9       **B.   Nominal Defendant**

10      33.   Qualcomm Incorporated is a Delaware corporation with its
11  headquarters at 5775 Morehouse Drive, San Diego, California 92121.
12  Qualcomm is an American public multinational corporation that creates
13  intellectual property, semiconductors, software, and services related to
14  wireless technology.

15      **C.   Executive Officer Defendant**

16      34.   Defendant Steve Mollenkopf has served as chief executive
17  officer of Qualcomm Incorporated since 2014, and serves on the Company's
18  Board. Before becoming CEO, Mollenkopf served as Qualcomm's President
19  and Chief Operating Officer ("COO").  Prior to his role as President and
20  COO, Mollenkopf led the Company's chipset business, overseeing the
21  launch of 4G technology. Mollenkopf lives in Rancho Santa Fe, which is part
22  of San Diego County.

23      **D.   Director Defendants**

24      35.   Defendant Mark D. McLaughlin has served as the Chairman of
25  the Board since August 2019 and as a director of the Company since July
26  2015.

27      36.   Defendant Mark Fields has served as a director since June 2018

28

SHAREHOLDER DERIVATIVE COMPLAINT

and currently is a member of Qualcomm's Audit Committee.

37.    Defendant Barbara T. Alexander was a director of Qualcomm from 2006 until approximately 2019.  Alexander reviewed and approved the 2019 Proxy and served as Chair of the Compensation Committee.

38.    Defendant Francisco Ros was a director of Qualcomm from 2010 until approximately 2019.  Ros reviewed and approved the 2019 Proxy and served as a member of the Governance Committee.

39.    Defendant Jeffrey W. Henderson has served as a director of the Company since January 2016. He currently serves as Chair of Qualcomm's Audit Committee.  He served as Chairman of the Board from March 2018 to August 2019.

40.    Defendant Ann M. Livermore has served as a director of the Company since October 2016. She currently is a member of Qualcomm's Governance Committee.

41.    Defendant Harish Manwani has served as a director of the Company since May 2014. He currently is a member of Qualcomm's Human Resources and the Compensation Committee.  Manwani is a Senior Operating Partner at Blackstone and in addition currently sits on the board of directors of many companies, including Qualcomm, Gilead Sciences, Tata Sons, Nielsen Holdings plc, Pearson plc, Whirlpool Corporation and The Economic Development Board (EDB) of Singapore. He is also non-Executive Chairman of Hindustan Unilever Limited in India.

42.    Defendant Jamie S. Miller has served as a director of the Company since May 2020.  She is currently a member of Qualcomm's Audit Committee.

43.    Defendant Clark T. Randt, Jr. has served as a director of the Company since October 2013.  He currently is the Chairman of Qualcomm's

SHAREHOLDER DERIVATIVE COMPLAINT

Governance Committee.

44.     Defendant Irene B. Rosenfeld has served as a director since October 2018.  She currently is Chairman of Qualcomm's Human Resources and the Compensation Committee.

45.     Defendant Kornelis Smit has served as a director since June 2018.  He currently is a member of Qualcomm's Governance Committee, Human Resources, and the Compensation Committee.

46.     Defendant Anthony J. Vinciquerra has served as a director since July 2015.  He currently is a member of Qualcomm's Audit Committee. Vinciquerra is also on the AFI Board of Trustees and currently serves as Chairman and CEO of Sony Pictures.

47.     The defendant identified in paragraph 34 is referred to herein as the "Executive Officer Defendant."   The Defendants identified in paragraphs 35 through 46 are referred to herein as the "Director Defendants."   Collectively, all defendants are referred to herein as the "Individual Defendants."

### E.     Doe Defendants

48.     Except as described herein, Plaintiff is ignorant of the true names of defendants sued as Does 1 through 30, inclusive, and therefore, Plaintiff sues these defendants by such fictitious names.  Following further investigation and discovery, Plaintiff will seek leave of this Court to amend this Complaint to allege their true names and capacities when ascertained. These fictitiously named defendants are Qualcomm officers, other members of management, employees, and/or consultants or third parties who were involved in the wrongdoing detailed herein.  These defendants aided and abetted, and participated with and/or conspired with the named defendants in the wrongful acts and course of conduct or otherwise caused the

SHAREHOLDER DERIVATIVE COMPLAINT

damages and injuries claimed herein and are responsible in some manner for the acts, occurrences, and events alleged in this Complaint.

### F.   Unnamed Participants

49.    Numerous individuals and entities participated actively during the course of and in furtherance of the wrongdoing described herein.  The individuals and entities acted in concert by joint ventures and by acting as agents for principals, to advance the objectives of the scheme and to provide the scheme to benefit Defendants and themselves to the detriment of Qualcomm.

## V.   RESPONSIBILITIES AND DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.   Responsibilities of the Individual Defendants

50.    Corporate officers and directors owe the highest fiduciary duties of care and loyalty to the corporation they serve.

51.    Board Members and Executive Officers are held to the highest level of ethics and compliance with the law.

52.    The Company's Corporate Governance Principles state:

The Board oversees the exercise of corporate powers and the Company's business affairs to ensure that they are managed to meet the Company's stated goals and objectives. The Board recognizes its responsibility to engage, and provide for the continuity of, executive management that possesses the character, skills and experience required to attain the Company's goals and to ensure that nominees for the Board of Directors possess appropriate qualifications and reflect a reasonable diversity of backgrounds and perspectives. Board members represent the collective interests of all stockholders of the Company and will act in good faith, with due care and in a manner he or she reasonably believes to be in the best interests of the Company.

53.    Qualcomm's Corporate Governance Principles also state:

**Board Member Criteria**

The Governance Committee is responsible for reviewing the appropriate skills and characteristics required of Board members in the context of prevailing business conditions and

18

composition of the Board. The qualifications and criteria considered in the selection of director nominees have the objective of assembling a Board that brings to the Company a reasonable diversity and variety of backgrounds, perspectives, experience and skills derived from high quality business and professional experience, with the Governance Committee also giving consideration to candidates with appropriate non-business backgrounds. . .

*As part of its efforts to create a diverse Board, including with respect to race, ethnicity and gender, the Governance Committee will include, and instruct any search firm it engages to include, women and racially/ethnically diverse candidates in the pool from which the Governance Committee selects director nominees*.[9]

54.     The Board is responsible for oversight and compliance with the Company's internal controls regarding diversity, anti-discrimination, pay equity, hiring and promotion.   As alleged herein, the Company's Board of Directors failed to act in good faith by failing to ensure compliance with these policies and controls.   These policies existed on paper, but were knowingly disregarded.

55.     The Board has obviously been aware at all relevant times that it is all-white and lacks diversity.  The Board and the Executive Officers also knew that diversity was lacking in the Company's workforce.   The Defendants' knowledge of the problems is reflected by their efforts to conceal the lack of diversity and discrimination.

56.     The Board knew the Company had policies in place on paper, but they failed to give the policies any teeth or enforcement.  The Board's conduct represented hypocrisy, bad faith, and disloyal conduct.  The Board

_____

[9] *See* Qualcomm's Corporate Governance Principles and Practices, available                                                                        at https://d1io3yog0oux5.cloudfront.net/_cf13d56813c1ec7af0aeb3f038c77a4e/qualcomm/db/720/6495/file/QCOM_+MASTER+Corporate+Governance+Principles+and+Practices_Proposed+Updates_050320_Clean.pdf, last visited July 13, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

had a duty to cause the Company to comply with the law and its own Corporate Governance Principles, and failed to do so.

57.   The direct involvement of Qualcomm's Board makes them interested in the outcome of this litigation because they face a substantial likelihood of liability.  Demand is thus futile.

**B.   Fiduciary Duties of the Individual Defendants**

58.   By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and continue to owe Qualcomm and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Qualcomm in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Qualcomm and not in furtherance of their personal interest or benefit.

59.   To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of Qualcomm were required to, among other things:

(a)   conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(b)   remain informed as to how Qualcomm conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in

SHAREHOLDER DERIVATIVE COMPLAINT

connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

### C.    Breaches of Fiduciary Duties by the Individual Defendants

60.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Qualcomm, the absence of good faith on their part, and a reckless disregard for their duties to the Company.

61.    The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to cover up Qualcomm's discrimination, and caused Qualcomm to incur substantial damage.

62.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Qualcomm, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such improper actions.  As a result, and in addition to the damage the Company has already incurred, Qualcomm has expended, and will continue to expend, significant sums of money.

### D.    Conspiracy, Aiding and Abetting, and Concerted Action

63.    At all relevant times, Individual Defendants were agents of the remaining Individual Defendants, and in doing the acts alleged herein, were acting within the course of scope of such agency.  The Individual Defendants ratified and/or authorized the wrongful acts of each of the other Individual Defendants.  The Individual Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper

21

acts, plans, schemes, and transactions that are the subject of this Complaint.

64.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of the improper acts, plans, schemes, and transactions that are the subject of this Complaint.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

65.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct, by failing to maintain adequate internal controls at the Company and covering up discrimination at the Company.

66.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did circumvent the internal controls at the Company and caused the Company to cover up Qualcomm executives' discrimination.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

67.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and waste of corporate assets, and to conceal adverse information concerning the Company's operations.

68.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by intentionally circumventing internal controls at the Company and causing the Company

22

1    to cover up discrimination at the Company. Because the actions described

2    herein occurred under the authority of the Board, each of the Individual

3    Defendants was a direct, necessary, and substantial participant in the

4    conspiracy, common enterprise, and/or common course of conduct

5    complained of herein.

6        69.    Each of the Individual Defendants aided and abetted and

7    rendered substantial assistance in the wrongs complained of herein. In

8    taking such actions to substantially assist the commission of the

9    wrongdoing complained of herein, each Individual Defendant acted with

10    knowledge of the primary wrongdoing, substantially assisted in the

11    accomplishment of that wrongdoing, and was aware of his or her overall

12    contribution to and furtherance of the wrongdoing.

13       **E.    The Directors' Roles and Committees at Qualcomm**

14       70.    The following chart sets forth the directors of Qualcomm as set

15    forth in the Company's most recent Proxy Statement and the committees on

16    which they serve:

| | | Committees | |
|---|---|---|---|
| Name | Audit | HR and Compensation | Governance |
| Barbara T. Alexander | | Chair | |
| Mark Fields | X | | |
| Jeffrey W. Henderson | Chair | | |
| Ann M. Livermore | | | X |
| Harish Manwani | | X | |
| Mark D. McLaughlin* | | | |
| Steve Mollenkopf | | | |
| Clark T. Randt, Jr. | | | Chair |
| Francisco Ros | | | X |
| Irene B. Rosenfeld | | X | |
| Kornelis "Neil" Smit | X | | |
| Anthony J. Vinciquerra | X | | |
| Number of Committee Meetings Held in Fiscal 2019 | 9 | 11 | 5 |

SHAREHOLDER DERIVATIVE COMPLAINT

## VI.    SUBSTANTIVE ALLEGATIONS

71.    Qualcomm's Board enjoys the dubious distinction of being one of only a handful of publicly-traded companies in the United States with zero Black individuals.

72.    The lack of diversity at the top at Qualcomm is significant.  The Board bears ultimate responsibility for ensuring the Company's compliance with federal and state laws prohibiting discrimination based on race, gender, and other factors.  Diversity in the workforce is a strong indication of a lack of discrimination; conversely, a lack of diversity provides a strong indication that discrimination is present.

73.    The son of Qualcomm's founder, who previously served as CEO, has acknowledged the Board's ultimate responsibility to ensure the Company is managed in compliance with all applicable laws and in accordance with strict fiduciary duties:

**LEADING BY EXAMPLE**

As a publicly held company, we are governed by a 12-member Board of Directors, which sets high standards for our executive leadership and all of our employees as it acts in the best interests of our stockholders. Our directors serve as prudent fiduciaries and oversee our Company's management. Board members are expected at all times to act in accordance with our Code of Ethics.[10]

74.    If the Qualcomm Board is vested with the responsibility of "Leading by Example," it has failed miserably at that role with respect to diversity; the Board still, in 2020, lacks any Black or minority individuals.

---

[10]    Statement by Paul E. Jacobs in Qualcomm's 2011 Social Responsibility Report, available at file:///C:/Users/fbottini/Downloads/2011-qualcomm-social-responsibility-report.pdf, last visited July 3, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

75. Qualcomm's own Chief Diversity Officer has stated that: "Diversity shouldn't be encouraged, it should be demanded as a critical business imperative."[11]

**A. Qualcomm Has Repeatedly Falsely Represented That It Has Made Substantial Progress Towards Diversity and Inclusion in Its Workplace and on the Board**

76. Qualcomm has repeatedly represented that it effectively promotes and achieves diversity and inclusion at the Company. For example, the Company's website states:

**Inclusion and Diversity**

Qualcomm aims to build an inclusive environment where everyone feels like they're part of the team.

*We further innovation and accelerate progress by fostering a diverse workforce.* We cultivate innovators who bring varying backgrounds, ideas, and points of views.

We are committed to building a pipeline of diverse talent. *Qualcomm is present at many diversity conferences and partner with many universities and organizations dedicated to building diversity and creating more opportunities for professional development and engagement.* We proudly focus on developing leaders and shaping future talent pools to help us meet the needs of our customers worldwide.[12]

77. The Individual Defendants have not only caused the Company to make vague statements about a "commitment" to diversity, but have approved false statements that Qualcomm has been successful in those

---

[11] Vicki Mealer-Burke, Qualcomm's Chief Diversity Officer. *See* Diana Goovaerts, "Q&A: Qualcomm pushes diversity for business boost," Mobile World Live, Mar. 12, 2020, available at https://www.mobileworldlive.com/featured-content/top-three/qa-qualcomm-pushes-diversity-for-business-boost/, last visited July 3, 2020.

[12] *See* https://www.qualcomm.com/company/corporate-responsibility/our-people/inclusion-diversity, last visited July 3, 2020.

25

efforts, which "*are measurable and produce actionable tasks*" and "*are having a tangible effect*":

> ***We're creating and implementing inclusion and diversity programs that are measurable and produce actionable tasks***.
>
> Qualcomm has a variety of initiatives to improve workplace diversity and inclusion, as seen below.
>
> We have a Diversity Task Force of senior vice presidents to review strategic programs and advise on best practices for driving diversity through collective data analysis. This task force also explores innovative hiring and retention best practices for implementation throughout our Company.
>
> We implement an Inclusion Awards program that uses a peer nomination process to recognize employees who demonstrate our inclusion and diversity values on a daily basis.
>
> We're measuring and tracking our progress to ensure that ***our programs and policies around inclusion and diversity are having a tangible effect***.[13]

78.    The Company's website also states:

> **We are committed to continuously building a pipeline of diverse talent.**
>
> Qualcomm actively seeks and recruits diverse candidates for positions at the company. Diverse teams, built around different perspectives, experiences and skill sets, fuel creativity and innovation. We're developing leaders and shaping future talent pools to help us meet the needs of our diverse customers worldwide. This means we're taking a broad approach to finding diverse candidates.[14]

79.    The Individual Defendants have also caused Qualcomm to represent that the Company has taken active and concerted steps to recruit African American individuals:

---

[13] *Id.* (emphasis in original).
[14] *Id.* (emphasis in original).

SHAREHOLDER DERIVATIVE COMPLAINT

**African Americans**

***Qualcomm supports engineering initiatives, such as hackathons, panel discussions, school visits, and mentoring, centered on African Americans***. We collaborate with the National Society of Black Engineers and AfroTech to provide career development opportunities for our employees, create interest in employment opportunities at Qualcomm and identify and recruit talent.[15]

80.     Defendant Mollenkopf, the CEO, has also repeatedly stated that he prizes diversity and that the supposed diversity that exists at Qualcomm makes the Company "a stronger, more effective company":

We believe the diversity of our employees makes us a stronger, more effective company.[16]

81.     In the Company's 2019 Corporate Responsibility Report, Defendant Mollenkopf also stated:

We remain dedicated to driving long-term growth and value for all our stakeholders. As such, I signed onto the Business Roundtable Statement on the Purpose of a Corporation. ***Becoming a signatory further demonstrates our commitment to good corporate citizenship and responsible innovation*** wherever we do business. ***Moreover, our commitment to operating with the highest ethical standards, transparency and integrity in key environmental, social and governance matters earned us an honored position on the 2019 Dow Jones Sustainability North America Index*** — a benchmark of companies leading the way to a sustainable world.[17]

82.     Qualcomm also states that:

---

[15] *Id.*

[16] *Id.*

[17]Available                                                                        at https://www.qualcomm.com/media/documents/files/2019-qualcomm-sustainability-report.pdf, last visited July 3, 2020.

27

In 2019, *we refreshed our inclusion and diversity training and rolled it out to our worldwide talent acquisition staff.* This training provides tips, tools, platforms and techniques to help us identify a broader range of world-class candidates, including underrepresented populations. . .

*We also revamped our strategy for participating in diversity and inclusion conferences to maximize the benefits that those critical events provide.* We engage as a high-level sponsor of professional conferences where we can reach technical talent in diverse communities and increased our senior leadership and hiring manager participation at these events.[18]

### B.   The Compensation Committee at Qualcomm is Responsible for the Company's Diversity and Inclusion Efforts

83.   At Qualcomm, the Directors sitting on the Compensation Committee are responsible for the Company's diversity and inclusion initiatives.  The 2019 Proxy stated:

<u>The Compensation Committee</u>. *The Compensation Committee* determines compensation levels for the Chief Executive Officer, the other executive officers and directors, administers and approves stock offerings under our employee stock purchase and long-term incentive plans, reviews our employee compensation and talent management policies and practices, *administers our incentive recoupment policy, reviews our workforce management policies, programs and initiatives focusing on diversity and inclusion,* and reviews executive officer development and succession planning.

84.   As the chart *supra* indicates, in 2019 and 2020 Qualcomm's Compensation Committee was comprised of Defendants Alexander, Manwani, and Rosenfeld.

### C.   The Governance Committee is Responsible for Nominating Individuals to the Company's Board

85.   In 2019 and 2020, Defendants Livermore, Randt, and Ros served on Qualcomm's Governance Committee.

---

[18] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

86.   The Charter of the Governance Committee states that the Committee is responsible for the following duties, among others:

- Review and approve the disclosures made by the Company in the Company's proxy statement or other documents filed with the Securities and Exchange Commission with respect to matters of corporate governance, including qualifications of Board members.

- Develop and implement annually a self-evaluation of its own performance.

- Oversee the management of risks associated with the matters for which the Committee is responsible.

- Consistent with the foregoing, take such actions as it deems necessary to encourage continuous improvement of, and foster adherence to, the Company's corporate governance policies, procedures and practices at all levels, and perform other corporate governance oversight functions as requested by the Board.

87.   At Qualcomm, the Governance Committee is responsible for nominating individuals to serve on Qualcomm's Board, as stated in the 2019 Proxy:

> [T]he Governance Committee evaluates and recommends nominees, including stockholder nominees, for membership on the Board and its committees.

85.   The Governance Committee states that its goal in nominating individuals to serve on the Board is to attain a "diversity of perspectives" but not any specific goals of ensuring adequate representation of Blacks or minorities:

> *The Governance Committee's goal is to assemble a board of directors that brings to us a **diversity of perspectives and skills** derived from high quality business and professional experience. In doing so, the Governance Committee also considers nominees with appropriate non-business backgrounds.*[19]

---

[19] *See* 2019 Proxy at p. 11.

SHAREHOLDER DERIVATIVE COMPLAINT

86.   With respect to the nominating process, the Governance Committee's charter also states:

> Actively seek individuals qualified to become Board members and make recommendations to the Board regarding Board nominees, including an annual recommendation with respect to those individuals to be nominated for election at the Company's annual meeting of stockholders. As part of this process the Committee shall consult with Board members, management and others to evaluate the knowledge and skills which should be considered in making nominations, including the knowledge and skills set forth in the Company's Corporate Governance Principles and Practices.

87.   In reality, Qualcomm has made no real efforts to promote diversity on its Board and among its senior executives.  Indeed, in the 2019 Proxy the word "diversity" only appears three (3) times.

**D.    At All Relevant Times, the Individual Defendants Have Had Actual Knowledge That, Contrary to Its Public Statements, Qualcomm Was Not Achieving Success With Respect to Its Diversity and Inclusion Initiatives and That Such Efforts Were Not Having a "Tangible Effect" on the Lack of Diversity at Qualcomm**

88.   Qualcomm, led by Steve Mollenkopf and the Board, has consistently refused to appoint Black and minority individuals to its Board and to management positions within the Company.  The Company has been criticized for its refusal to do so, but has persisted in its intransigence.

89.   And the lack of diversity at the top at Qualcomm has resulted in economic discrimination.  The pay of the Company's CEO in 2018 was 233 times as high as the median pay of all other employees:

> For fiscal 2018, our last completed fiscal year:
>
> • the annual compensation of our CEO, as reported in the Summary Compensation Table included on page 54 of this proxy statement, was $19,975,472;

SHAREHOLDER DERIVATIVE COMPLAINT

- the annual total compensation of our median employee was $85,592; and

- **the resulting ratio was 233 : 1**.[20]

90.    Instead of acknowledging the problem and demanding change, Qualcomm has instead issued false statements claiming success in achieving diversity and inclusion.

### E.    False and Misleading 2019 and 2020 Proxy Statements Approved by the Director Defendants

91.    Notwithstanding their knowledge about Qualcomm's failure to promote and achieve diversity and its discriminatory hiring and promotion practices, the Director Defendants have caused Qualcomm to issue Proxy Statements that were materially misleading.  The Company's 2019 Proxy was filed with the SEC on January 24, 2019 and signed by Directors Mollenkopf, Alexander, Fields, Livermore, Henderson, Manwani, McLaughlin, Randt, Ros, Rosenfeld, Smit, and Vinciquerra.

92.    The Company's 2020 Proxy Statement was filed with the SEC on January 23, 2020 and was approved by Defendants Mollenkopf, Fields, Henderson, Livermore, Manwani, McLaughlin, Randt, Rosenfeld, Smit, and Vinciquerra.

93.    In the 2019 Proxy, the Directors represented that the goal of the Company's Governance Committee was to assemble a diverse Board:

> *The Governance Committee's goal is to assemble a board of directors that brings to us a diversity of perspectives and skills* derived from high quality business and professional experience. In doing so, the Governance Committee also considers nominees with appropriate non-business backgrounds.

---

[20] *See* Qualcomm 2019 Proxy Statement at p. 56.

31

94.    In the 2020 Proxy Statement, the Company stated:

The qualifications and criteria considered in the selection of director nominees have the objective of assembling a Board that brings to the Company a reasonable diversity and variety of backgrounds, perspectives, experience and skills derived from high quality business and professional experience, with the Governance Committee also giving consideration to candidates with appropriate non-business backgrounds. *As part of its efforts to create a diverse Board, including with respect to race, ethnicity and gender, the Governance Committee will include, and instruct any search firm it engages to include, women and racially/ethnically diverse candidates in the pool from which the Governance Committee selects director nominees*.

95.    These statements in the 2019 and 2020 Proxy Statements were highly misleading.  By using the term "a board of directors that brings us a diversity of perspectives and skills," the Proxy suggests that the Governance Committee has a goal of achieving diversity on the Board by seeking to achieve representation of diverse persons – *i.e.*, Blacks and other minorities.  In reality, however, the Governance Committee does not have a goal of increasing the racial diversity of applicants for Board seats and instead only has a goal of increasing diversity of skills among Board candidates.

96.    Moreover, the representation that "*the Governance Committee will include, and instruct any search firm it engages to include, women and racially/ethnically diverse candidates in the pool from which the Governance Committee selects director nominees*" was misleading because it suggested that the Company was actively seeking to achieve racial and ethnic diversity in its Board membership.  Despite allegedly requiring racially and ethnically diverse candidates to be included in the director nominee pool, the fact remains that Qualcomm has no African Americans on its Board, and that no African American or other minority candidate has been elected to the Qualcomm Board in the last six years.  The undisclosed truth therefore is that Qualcomm may have a policy of attempting to

32

include racially and ethnically diverse candidates in its director nominee pool, but it either has no intention to actually nominate such persons to its Board or it engages in efforts to thwart the nomination of such persons and prefers non-diverse applicants in the pool.

97.    Indeed, elsewhere in the 2019 Proxy the Company lists the following factors that are considered by the Governance Committee when selecting Board applicants:

> In evaluating director nominees, the Governance Committee considers the following factors:
>
> • The appropriate size of the Board;
>
> • Our needs with respect to the particular talents, experience and diversity of our directors;
>
> • The knowledge, skills and experience of nominees, including experience in technology, business, finance, administration or public service, in light of prevailing business conditions and the knowledge, skills and experience already possessed by other members of the Board;
>
> • Familiarity with national and international business matters;
>
> • Experience in political affairs;
>
> • Experience with accounting rules and practices;
>
> • Appreciation of the relationship of our business to the changing needs of society;
>
> • The nominee's other commitments, including the other boards on which the nominee serves; and
>
> • The desire to balance the considerable benefit of continuity with the periodic injection of the fresh perspective provided by new members.

98.    The 2020 Proxy listed almost identical factors as those considered by Qualcomm when nominating director candidates:

> In evaluating director nominees, the Governance Committee considers, among others, the following factors:
>
> • The appropriate size of the Board;

33

SHAREHOLDER DERIVATIVE COMPLAINT

- Our needs with respect to the particular talents, experience and diversity of our directors;

- The knowledge, skills and experience of nominees, including experience in technology, business, finance, administration or public service, in light of prevailing business conditions and the knowledge, skills and experience already possessed by other members of the Board;

- Familiarity with national and international business matters;

- Experience in political affairs;

- Experience with accounting rules and practices;

- Appreciation of the relationship of our business to the changing needs of society;

- Board tenure, including the desire to balance the considerable benefit of continuity with the periodic injection of the fresh perspectives provided by new members; and

- The nominee's other commitments, including the other boards on which the nominee serves.

99.    As is evident, racial diversity is not among the relevant factors which the Governance Committee lists as considerations in its decisions with respect to Board nominees.

100.   The Governance Committee at Qualcomm is responsible for nominating candidates to the Board.    The Company's Corporate Governance Principles state that:

> *As part of its efforts to create a diverse Board, including with respect to race, ethnicity and gender, the Governance Committee will include, and instruct any search firm it engages to include, women and racially/ethnically diverse candidates in the pool from which the Governance Committee selects director nominees.[21]*

---

[21] *See* Qualcomm's Corporate Governance Principles and Practices, available at https://d1io3yog0oux5.cloudfront.net/_cf13d56813c1ec7af0aeb3f038c77a4e/qualcomm/db/720/6495/file/QCOM_+MASTER+Corporate+Governance+Principles+and+Practices_Proposed+Updates_050320_Clean.pdf, last visited July 13, 2020.

34

101.  The 2019 Proxy contained information that was at odds with information in the Company's Corporate Governance Principles.  The 2019 Proxy stated that the Governance Committee's goal was to "assemble a board of directors that brings to us a diversity of perspectives and skills" whereas the Corporate Governance Principles claim that the Governance Committee "will include, and instruct any search firm it engages to include, women and racially/ethnically diverse candidates in the pool from which the Governance Committee selects director nominees."  In other words, the 2019 Proxy stated that the goal of the Governance Committee is only diversity of skills and perspectives, while the Governance Principles state that racial and ethnic diversity is not only a goal but that the Committee demands that racial and ethnic minorities be included in the pool of potential Board candidates.

102.  Due to these disparities and conflicts between the 2019 Proxy and the Corporate Governance Principles, the Proxy Statements were materially misleading.  And if Qualcomm's answer is that there is no conflict since the Company intended the term "diversity" in the 2019 Proxy to include racial and ethnic diversity, such explanation is contrary to the plain language in the 2019 Proxy, which contains no reference to ethnic and racial diversity and only mentions the word diversity three (3) times.

103.  In addition, if the Governance Committee "instructs" the search firms it employs to include racial and ethnic minorities in the pool from which Board nominees are chosen, why are there no African Americans on Qualcomm's Board and why have no racial or ethnic minorities been elected to the Qualcomm Board in the last at least six years?

104.  At Qualcomm, one of the ways the Company has inhibited and prevented diverse candidates from being nominated to serve on the Board

SHAREHOLDER DERIVATIVE COMPLAINT

is through restrictive and unreasonable provisions that place a high bar on shareholders' ability to nominate candidates other than the incumbent directors.  As admitted in the 2019 Proxy:

> Our Bylaws contain provisions that address the process (including required information and deadlines) by which a stockholder may nominate an individual to stand for election to the Board at our annual meeting of stockholders. In addition, the "proxy access" provisions of our Bylaws provide that, ***under certain circumstances, a stockholder or group of up to 20 stockholders may seek to include director nominees in our proxy statement if such stockholder or group of stockholders own at least 3% of our outstanding common stock continuously for at least the previous three years. The number of stockholder nominees appearing in the proxy statement for our annual meeting cannot exceed 20% of the number of directors to be elected***. If 20% of the number of directors is not a whole number, the maximum number of stockholder nominees is rounded down to the next whole number.[22]

105.  As this statement indicates, any  Qualcomm shareholder wanting to nominate a new individual to the Board – for example, an African American individual – has to own 3% of the Company's stock, or alternatively somehow get in contact with and convince 19 other shareholders who collectively own 3% of the Company's stock to agree to nominate the individual.  The 2019 Proxy disclosed that "At the close of business on the Record Date, we had 1,210,199,813 shares of common stock outstanding and entitled to vote."  Thus, 3% of Qualcomm's shares equates to 3,630,599 shares.

106.    At Qualcomm's current stock price of approximately $93.50, a shareholder would have to own $399,461,006 in Qualcomm stock in order to have the right to nominate an African American individual to Qualcomm's

---

[22] *See* 2019 Proxy at p. 10.

SHAREHOLDER DERIVATIVE COMPLAINT

Board.  No wonder there are no Blacks on Qualcomm's Board.

107.  But the restrictions do not end there.  In addition to having to own 3% of Qualcomm's stock, a shareholder has to have owned the stock "continuously for at least the last three years."  So there is a three-year waiting period even after a person buys Qualcomm stock in order to be able to nominate a director to the Board.[23]

108.  Qualcomm's Proxy Statement was also materially misleading because it contained material omissions: it failed to disclose that the purpose and effect of its "proxy access" rules, in combination with the policies of its Governance Committee, was to inhibit the nomination and election of Blacks and minorities to the Board.  These material omissions would have been material to a shareholder's decision as to whether to re-elect the incumbent directors at the annual meeting.  In the 2019 Proxy, the reelection of the incumbent directors was Item No. 1.  With respect to the election, the Board asked shareholders to vote in favor, stating:

> The affirmative vote of a majority of the votes cast at the Annual Meeting at which a quorum is present, either in person or by proxy, is required to elect each of the 12 nominees for director, meaning that the number of shares cast "for" a nominee's election exceeds the number of "withhold" votes cast against that nominee. If you hold your shares in your own name and abstain from voting on this matter, your abstention will have no effect on the vote. If you hold your shares through a broker and you do not instruct the broker on how to vote for each of the 12 nominees, your broker will not have the authority to vote your shares. Abstentions and broker non-votes will each be counted

_____

[23] At some point in 2020, in response to shareholder backlash at these onerous requirements, Qualcomm apparently changed the requirements to 1% of the Company's stock for at least a one-year holding period.  But even at these levels, no individual shareholder owns enough stock to nominate a person to serve on the Board.  Even Defendant Mollenkopf, who is the Company's third largest shareholder (after Vanguard and BlackRock), owns less than 1% of the Company's stock.

SHAREHOLDER DERIVATIVE COMPLAINT

as present for purposes of determining the presence of a quorum but will not have any effect on the outcome of the vote.

**THE BOARD RECOMMENDS A VOTE "FOR" THE ELECTION OF EACH OF THE ABOVE NOMINEES.**[24]

109.   The Proxy was also materially misleading because it failed to disclose that the Company does not have term limits, and that the purpose of the lack of term limits is to entrench the current directors in office and prevent African Americans and minorities from having fair opportunities to be elected to the Board.

110.   To attempt to justify its racism, Qualcomm's Board has resisted efforts to appoint new members to its Board by claiming that the individuals who have served on the Board for, in some cases decades, have experience that is valuable to the Company. The Proxy was false and misleading for failing to disclose the lack of term limits and the true reasons and effect of the lack of term limits.

111.   In reality, longer-tenured directors do not serve the best interests of the Company, as amply demonstrated by leading academics and professionals in the field of best corporate governance principles. A report by the Harvard Law School Forum on Corporate Governance noted that:

> Investor respondents to ISS' 2016–2017 Global Policy Survey (conducted between Aug. 2, 2016 and Aug. 30, 2016) were asked which tenure-related factors — with multiple answers allowed — would give rise to concern about a board's nominating and refreshment processes. *__Among the 120 institutional investors (one-third of whom each own or manage assets in excess of $100 billion) who responded, 68 percent pointed to a high proportion of directors with long tenure as cause for concern, 53 percent identified an absence of newly-appointed independent directors in recent years as a potential problem, and 51 percent flagged lengthy average tenure as problematic.__* Just 11 percent of the investor respondents said

---

[24] *See* 2019 Proxy at p. 20.

38

that tenure is not a concern, although even several of those respondents indicated that an absence of newly-appointed directors is a concern.[25]

112.   The Director Defendants' refusal to adopt director term limits and to appoint new black and minority members to the Board represents explicit or implicit racism at Qualcomm, and an improper pretext for failing to add Black and minority individuals to the Board.  By falsely asserting that term limits would deprive Qualcomm of the "experience" of older white members who have served on the Board for decades, the Director Defendants made intentionally or recklessly false statements in order to get themselves reelected and to conceal the true reasons for Qualcomm's long-standing failure to add Blacks to its Board.

113.   The 2019 and 2020 Proxy Statements were also materially misleading because they asked shareholders to vote in favor of executive compensation "say on pay" proposals, but failed to disclose that none of Qualcomm's executive compensation decisions take into consideration whether the executives have been successful in achieving the Company's critical diversity and inclusion goals.

114.   For example, the 2019 Proxy stated:

In executive session without our CEO or other executive officers present, the Compensation Committee approved our CEO's and other executive officers' fiscal 2018 equity award amounts, the fiscal 2018 ACIP earned amounts, and any adjustments to base salaries and ACIP targets for fiscal 2019. In making these decisions, and in determining the amounts and mix of executive compensation, the Compensation Committee considered the following factors, among others:

---

[25]   *Available at* https://corpgov.law.harvard.edu/2017/02/09/board-refreshment-trends-at-sp-1500-firms/ (last visited June 21, 2020).

SHAREHOLDER DERIVATIVE COMPLAINT

- Feedback from other Board members regarding the leadership contributions of our CEO and other executive officers to our annual and long-term performance;

- Feedback from the Compensation Committee members;

- Our business performance;

- Feedback from our CEO regarding our business performance, his performance and his evaluation of and compensation recommendations for the other executive officers;

- The executive officers' individual performance and contributions to financial and strategic objectives, including expertise, skills and tenure in position;

- Labor market conditions and the executive officers' potential to assume increased responsibilities;

- Operational management, such as project milestones, process improvements and expense management;

- Internal working and reporting relationships and teamwork among our executive officers (for example, using the same ACIP financial metrics and objectives for all executive officers promotes teamwork and collaboration and our executive officers' contribution to Company-wide initiatives);

- The Compensation Committee's intention for compensation to be internally fair and equitable relative to roles, responsibilities and relationships, in addition to being competitively reasonable;

- ***Developing and motivating employees*** (such as establishing processes for identifying and assessing high potential employees) and ***attracting and retaining employees (such as initiatives to increase the pipeline of women in leadership roles***); and

- ***Leadership actions that support our ethical standards and compliance culture***.

115. The 2020 Proxy had an almost identical statement with respect to the factors considered by Qualcomm's Compensation Committee when determining executive compensation:

> In executive session without our CEO or other executive officers present, the HR and Compensation Committee approved the fiscal 2019 equity award amounts, the fiscal 2019 ACIP earned amounts and any adjustments to base salaries and ACIP targets for fiscal 2020. In making these decisions and determining the

40

amounts and mix of executive compensation, the HR and Compensation Committee considered the following factors, among others:

● Labor market conditions, competitive compensation for comparable positions and threats to our business due to retention-related risks.

• Business performance including operational management such as project milestones, process improvements and expense management.

• Feedback from our CEO regarding the performance of our business, his performance and his evaluation of and compensation recommendations for the other executive officers.

• *The executive officers'* individual performance and *contributions to* financial and *strategic objectives*, including expertise, skills, tenure in position and potential to assume increased responsibilities.

• Internal working and reporting relationships and teamwork among our executive officers (for example, using the same ACIP financial metrics and objectives for all executive officers promotes teamwork and collaboration and our executive officers' contribution to Company-wide initiatives).

• The HR and Compensation Committee's intention for compensation to be internally fair and equitable relative to roles, responsibilities and relationships, in addition to being competitively reasonable.

• *Leadership actions that support our ethical standards and compliance culture*.

• *Developing and motivating employees (such as establishing processes for identifying and assessing high potential employees) and attracting and retaining employees (such as initiatives to increase the pipeline of women in leadership roles)*.

116.   These statements about executive compensation were false and misleading.   The statements suggested that executive compensation took into consideration "leadership actions that support our ethical standards and *compliance culture*" and efforts towards increasing diversity and increasing the pipeline of women in leadership roles.  In reality, those kinds of salutary and important goals do not count for any kind of significant weighting towards the amount of compensation that gets awarded to

41

executives at Qualcomm.   In fact, at Qualcomm over 90% of executive compensation is based on the Company's financial performance.

117.   These omitted facts, had they been disclosed, would have been highly material to stockholders' decisions as to whether to reelect the Board nominees and vote in favor or against the "say on pay" executive compensation proposals.  Diversity and inclusion are valued very highly by shareholders, including Plaintiff, and the omitted fact that Qualcomm does not include any significant weight (if any) to executives' success or lack thereof in achieving the Company's diversity goals would have been very important to shareholders' voting deliberations.

118. The false statements and material omissions in the Proxy Statements had their desired effect.  At Qualcomm's annual meetings in 2019 and 2020, all the incumbent white directors were reelected.   No competing Black or minority candidates made it on the ballot or were elected.   The executive compensation "say on pay" proposals were approved.  PWC was reappointed as the Company's auditor.

119.   The 2019 and 2020 Proxy Statements were false and misleading because they omitted and failed to disclose that:

(a)   the statement in the 2020 Proxy that "*the Governance Committee will include, and instruct any search firm it engages to include, women and racially/ethnically diverse candidates in the pool from which the Governance Committee selects director nominees*" was misleading because it suggested that the Company was actively seeking to achieve racial and ethnic diversity in its Board membership, while the undisclosed reality is that Qualcomm may have a policy of attempting to include racially and ethnically diverse candidates

SHAREHOLDER DERIVATIVE COMPLAINT

in its director nominee pool, but it either has no intention to actually nominate such persons to its Board or it engages in efforts to thwart the nomination of such persons and prefers non-diverse applicants in the pool;

(b)      that the Company does not have term limits due to a desire to retain the experience of the incumbent Director Defendants, but instead to keep minorities off the Board;

(c)      That the Company's refusal to disclose its median salary and pay/employment data in an annual report is due to a desire to conceal existing, known pay disparity at the Company which adversely affects women and minorities;

(d)      That the Company's executive compensation decisions do not take into consideration in any way the executives' success or lack thereof in achieving the Company's diversity and inclusion goals; moreover, that the Company's stated policies with respect to diversity and anti-discrimination were not effective and were not being complied with;

(e)      That the Board's Governance Committee did not take racial and ethnic diversity into consideration when nominating Board candidates, as opposed to including persons in the pool of potential nominees, and instead simply sought to create a false appearance of seeking diversity among potential Board candidates;

(f)      Defendants' knowledge that the Company's internal controls and systems were inadequate and ineffective to protect minorities against discrimination in hiring, promotion, and other critical terms of employment and equal access;

SHAREHOLDER DERIVATIVE COMPLAINT

(i)    That Defendants failed to maintain appropriate policies, internal controls, and procedures to ensure that the Company's stated policies with respect to diversity and anti-discrimination were being complied with;

(j)    That the Company's diversity and inclusion programs were not achieving measurable and actionable results, and needed substantial improvement; and

(k)    That, as a result, the Company was at substantial risk of large monetary fines, penalties, and adverse judgments from lawsuits due to the fact that the Company was not in compliance with federal and state laws regarding hiring, promotion, and pay practices.

120.   The 2019 and 2020 Proxy Statements harmed the Company by interfering with the proper governance on its behalf that requires stockholders' informed voting of directors. As a result of the false or misleading statements in the Proxies, stockholders voted to reelect all of the Defendants to the Board each year.

121.   The statements in the 2019 and 2020 Proxy Statements conveyed that the Company's corporate governance structure was "effective" and provided "oversight of management and Board accountability." In reality, the Company's corporate governance structure and defective internal controls allowed senior executives and the Board to sidestep real accountability and instead continue perpetuating the discriminatory practices that led to the Company's discriminatory pay practices, private class action lawsuits filed by female employees and other discrimination in hiring practices, and lack of diversity on both the Board and management.

122.   The 2019 and 2020 Proxies, which contained materially

SHAREHOLDER DERIVATIVE COMPLAINT

misleading statements and thus deprived shareholders of adequate
information necessary to make a reasonably informed decision, caused the
Company's stockholders to reelect all of the Defendants to the Board and
approve executive compensation proposals while the Defendants were
breaching their fiduciary duties to the Company and deliberately
concealing material information concerning the Company's discrimination
against Black and other minority individuals and its effects on the
Company's business and reputation.

**F.**   **Qualcomm's Governance Committee Members Have Repeatedly Breached Their Fiduciary Duties to Ensure Diversity on the Board**

123.   The Charter of the Governance Committee sets forth the duties
of the Board members serving on such committee.   Among those duties,
with respect to the nomination of candidates to serve on Qualcomm's
Board, are the following:

> *As part of its efforts to create a diverse Board, including with respect to race, ethnicity and gender, the Governance Committee will include, and instruct any search firm it engages to include, women and racially/ethnically diverse candidates in the pool from which the Governance Committee selects director nominees.*[26]

124.   The 2019 Proxy also stated the following with respect to the
Governance Committee responsibilities:

---

[26] *See* Qualcomm's Corporate Governance Principles and Practices, available at https://d1io3yog0oux5.cloudfront.net/_cf13d56813c1ec7af0aeb3f038c77a4e/qualcomm/db/720/6495/file/QCOM_+MASTER+Corporate+Governance+Principles+and+Practices_Proposed+Updates_050320_Clean.pdf, last visited July 13, 2020.

45

- *Review annually a report on the Company's policies and programs concerning corporate citizenship and social responsibility*, including charitable giving.

- *Review and approve the disclosures made by the Company in the Company's proxy statement* or other documents filed with the Securities and Exchange Commission with respect to matters of corporate governance, including qualifications of Board members.

- Consistent with the foregoing, *take such actions as it deems necessary to encourage continuous improvement of, and foster adherence to, the Company's corporate governance policies, procedures and practices at all levels*, and perform other corporate governance oversight functions as requested by the Board.

- *Actively seek individuals qualified to become Board members and make recommendations to the Board regarding Board nominees, including an annual recommendation with respect to those individuals to be nominated for election at the Company's annual meeting of stockholders.* As part of this process the Committee shall consult with Board members, management and others to *evaluate the knowledge and skills which should be considered in making nominations, including the knowledge and skills set forth in the Company's Corporate Governance Principles and Practices*.

- *Periodically evaluate the size and composition of the Board*, make recommendations to the Board as a result of such evaluations, and consider and make recommendations to the Board regarding comments from stockholders relating to Board composition.

125. The members of the Governance Committee (Livermore and Randt) have breached their fiduciary duties as directors by failing to fulfill these duties. Rather than causing Qualcomm to comply with its corporate governance principles, Livermore and Randt have caused Qualcomm to merely pay lip service to these principles. Instead of recommending well-qualified black and minority candidates to serve on Qualcomm's Board, Livermore and Randt have perpetuated the all-white Board under the pretext that the existing members' "experience" and long tenure on the Board is beneficial to Qualcomm.

126.   Moreover, to entrench themselves and their fellow directors in office, all the Director Defendants have opposed term limits in order to prevent the addition of qualified blacks and minorities to the Board.

127.   As the saying goes, the rich get richer while the poor get poorer. Serving on Qualcomm's Board has enriched the already-rich elites whose profitable sinecure has been perpetuated by the Defendants' wrongdoing. Many qualified black and minority candidates would enjoy the prestige and compensation that comes with a position on Qualcomm's Board.   The following chart sets forth the compensation earned by outside directors on Qualcomm's Board in 2019:

### Fiscal 2019 Director Compensation (1)(2)

| Name | Fees Earned or Paid in Cash ($) (3) | Stock Awards ($) (4) | All Other Compensation ($) (5) | Total ($) |
|------|-----|-----|-----|-----|
| Barbara T. Alexander | 141,500 | 200,048 | 50,000 | 391,548 |
| Martin B. Anstice | 17,261 | 73,867 (6) | — | 91,128 |
| Mark Fields | 113,500 | 200,048 | — | 313,548 |
| Jeffrey W. Henderson | 290,198 | 200,048 | 11,005 | 501,251 |
| Thomas W. Horton | 49,705 | — | 50,000 | 99,705 |
| Ann M. Livermore | 107,500 | 200,048 | 50,000 | 357,548 |
| Harish Manwani | 133,500 | 200,048 | — | 333,548 |
| Mark D. McLaughlin | 138,302 | 200,048 | 50,000 | 388,350 |
| Clark T. Randt, Jr. | 122,500 | 200,048 | 9,000 | 331,548 |
| Francisco Ros | 127,500 | 200,048 | — | 327,548 |
| Irene B. Rosenfeld | 113,098 | 273,915 (6) | 50,000 | 437,013 |
| Kornelis "Neil" Smit | 113,500 | 200,048 | 50,000 | 363,548 |
| Anthony J. Vinciquerra | 113,500 | 200,048 | 25,000 | 338,548 |

128.   In addition to awarding themselves substantial compensation for serving on the Board, the Director Defendants lavished the Company's executives with the following compensation:

SHAREHOLDER DERIVATIVE COMPLAINT

## Fiscal 2019 Summary Compensation Table (1)

| Name and Principal Position | Year | Salary ($) (2) | Bonus ($) (3) | Stock Awards ($) (4) | Option Awards ($) (5) | Non-Equity Incentive Plan Compensation ($) (6) | All Other Compensation ($) (7) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| **Steve Mollenkopf** Chief Executive Officer | 2019 | 1,198,709 | — | 21,600,213 | — | — | 266,130 | 23,065,052 |
| | 2018 | 1,390,739 | — | 10,000,072 | 6,003,095 | 2,260,000 | 321,566 | 19,975,472 |
| | 2017 | 1,156,079 | — | 8,000,035 | — | 2,260,000 | 175,196 | 11,591,310 |
| **Akash Palkhiwala** Executive Vice President and Chief Financial Officer | 2019 | 540,607 (8) | 250,000 | 3,837,614 (9) | — | 291,200 | 42,998 | 4,962,419 |
| | 2018 | | | | | | | |
| | 2017 | | | | | | | |
| **Cristiano R. Amon** President | 2019 | 1,111,577 | — | 12,200,138 | — | — | 113,190 | 13,424,905 |
| | 2018 | 916,964 | — | 11,000,110 | — | 1,575,000 | 132,825 | 13,624,899 |
| | 2017 | 750,006 | — | 6,675,108 | — | 1,250,000 | 74,627 | 8,749,741 |
| **James H. Thompson** Executive Vice President, Engineering, Qualcomm Technologies, Inc. and Chief Technology Officer | 2019 | 837,361 | — | 10,700,192 | — | — | 182,136 | 11,719,689 |
| | 2018 | 905,634 | — | 7,000,156 | — | 1,036,000 | 194,792 | 9,136,582 |
| | 2017 | 723,102 | — | 6,200,077 | — | 1,100,000 | 169,396 | 8,192,575 |
| **Alexander H. Rogers** Executive Vice President and President, Qualcomm Technology Licensing | 2019 | 737,242 | — | 6,400,165 | — | — | 76,755 | 7,214,162 |
| | 2018 | | | | | | | |
| | 2017 | | | | | | | |
| **George S. Davis** Former Executive Vice President and Chief Financial Officer | 2019 | 400,467 | — | — | — | — | 91,901 | 492,368 |
| | 2018 | 875,083 | — | 5,500,133 | — | 1,064,000 | 122,990 | 7,562,206 |
| | 2017 | 760,011 | — | 5,000,083 | — | 1,050,000 | 181,149 | 6,991,243 |
| **David E. Wise** Former Senior Vice President and Interim Chief Financial Officer | 2019 | 1,079,221 (8) | — | 1,500,133 (9) | — | — | 145,083 | 2,724,437 |
| | 2018 | | | | | | | |
| | 2017 | | | | | | | |

129.   These huge salaries to the Company's executives have been awarded by the Compensation Committee Directors (Defendants Alexander, Manwani, McLaughlin, and Rosenfeld) while systematically underpaying minorities and women.   In 2018, Defendant Mollenkopf ranked #21 on the list of the 100 highest paid CEOs, with total compensation of $19,975,472.[27] Qualcomm reported this figure in its 2019 Proxy, which

---

[27]   *See* https://www.equilar.com/reports/63-table-highest-paid-ceos-2019-equilar-100.html, last visited July 7, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

stated:

> For fiscal 2018, our last completed fiscal year:
> - the annual compensation of our CEO, as reported in the Summary Compensation Table included on page 54 of this proxy statement, was $19,975,472;
> - the annual total compensation of our median employee was $85,592; and
> - **the resulting ratio was 233 : 1**.[28]

130.   During 2019, the pay disparity at Qualcomm got even worse. As disclosed in the 2020 Proxy Statement:

> For fiscal 2019, our last completed fiscal year:
> - the annual compensation of our CEO, as reported in the Summary Compensation Table included on page 59 of this proxy statement, was $23,065,052;
> - the annual total compensation of our median employee was $90,259; and
> - **the resulting ratio was 256 : 1.**

131.   The inequitable compensation awarded to Mollenkopf and other executives by Defendants Alexander, Manwani, McLaughlin, and Rosenfeld was so egregious that BlackRock, the Company's second-largest shareholder, objected to the compensation and voted against the "say on pay" executive compensation proposal in the Company's proxy statement. *See* Attracta Mooney, "*BlackRock Rebels Over Executive Pay at Qualcomm*," THE FINANCIAL TIMES, Mar. 11, 2020.  The article noted:

> *BlackRock has rebelled over executive pay at Qualcomm, criticising the chipmaker's decision to award its chief executive a $3.6m bonus in a rare public rebuke from the world's biggest asset manager.*

---

[28] *See* Qualcomm 2019 Proxy Statement at p. 56.

SHAREHOLDER DERIVATIVE COMPLAINT

*The $7.4tn investment company said Qualcomm failed to provide "sufficient justification" for its decision to provide an equity award to chief executive Steve Mollenkopf and other executives* after they settled a bitter legal battle with Apple in 2019.

Mr Mollenkopf received a $22.5m package last year, mainly in shares, according to Institutional Shareholder Services, the world's largest adviser to shareholders.

*BlackRock, Qualcomm's second-largest shareholder, voted against the so-called say on pay resolution at the company's annual meeting on Tuesday,* playing a decisive role in ensuring that Qualcomm lost its non-binding vote on executive remuneration.

Mr Mollenkopf was given the $3.6m award of full-vested shares last year after Apple and Qualcomm announced the dismissal of all litigation between the parties and agreed to a historic six-year licence agreement in April. The dispute had been weighing on investor sentiment at Qualcomm. When it was resolved, the company's shares surged 40 per cent in a week.

Qualcomm declined to comment but in a January filing it said that "one-time grants" between $250,000 and $3.6m were issued to executives "to recognise outstanding efforts in entering into multiyear licence and chipset supply agreements with Apple." Its Compensation Committee considered the payments appropriate, given "the anticipated long-term stockholder value" of the agreement.

BlackRock acknowledged the event's "importance" but said that Qualcomm "did not provide sufficient justification for why this outcome with Apple is outside Mr. Mollenkopf's realm of responsibilities as CEO, which are already covered in the company's long-term executive compensation plan."

It added: *"Ultimately, granting this one-off award suggests a pay plan that is not aligned with shareholders' long-term interests, which is difficult to reconcile with ongoing underperformance versus Qualcomm's peers, raising a perceived pay-for-performance disconnect*." . . .

*The fund manager also voted against the re-election of Harish Manwani, the longest-tenured member of the company's remuneration committee.* According to Capital IQ, the data provider, BlackRock holds more than 7 per cent of Qualcomm's shares.

SHAREHOLDER DERIVATIVE COMPLAINT

*BlackRock rarely publicly criticises companies*, instead focusing on private conversations with board directors to try to influence businesses. In January, however, BlackRock boss Larry Fink announced plans to be more transparent about its voting record at annual meetings and its discussions with companies.

## G. The Director Defendants Breached Their Duties of Loyalty and Good Faith by Failing to Ensure the Company's Compliance with Federal and State Laws Regarding Diversity and Anti-Discrimination

132.   The Director Defendants have known for years that Qualcomm has been violating federal and state laws regarding diversity, equal pay, and discrimination against women and minorities.

133.   Defendants' knowledge is reflected by the fact that, in 2016, the Company was forced to settle a class action lawsuit alleging unfair and disparaging pay to women.

134.   The Director Defendants, however, knew that Qualcomm had not corrected all the problems with respect to fair and equitable pay to women and minorities and disclosures and best practices regarding pay equity.

135.   Four years after the class action settlement, in 2020 Qualcomm still received an "F" grade in gender pay equity. *See* "*Gender Pay Equity Report: F Grades for Oracle, Qualcomm, Verizon, AT&T,*" DATAQUEST, April 1, 2020.[29]  The article noted that:

Gender and racial pay gaps at some of the world's largest corporations has been an area of increased concern and focus, as pay discrepancies raise reputational, regulatory, financial and legal risks. Consequently, an increasing number of shareholders

---

[29]  Available at https://www.dqindia.com/gender-pay-equity-report-f-grades-oracle-qualcomm-verizon-att-analog-devices/, last visited July 13, 2020.

51

SHAREHOLDER DERIVATIVE COMPLAINT

have asked companies to report on their analyses, policies, and goals to reduce any gender/racial pay gaps.

**Key findings:**

By sector, the highest and lowest-rated companies were: **Tech/Communications**: No company is this sector received an "A," though Apple and Intel both were graded "B." A score of "C" was given to Alphabet, Expedia, Facebook, eBay, Microsoft, Texas Instruments, and Adobe. Hewlett Packard rated a "D" and ***"F" grades were assigned to Verizon Communications, AT&T Inc., Oracle, Qualcomm, and Analog Devices***. . . .

***The unadjusted "median" gender/racial pay disclosures—as opposed to statistically adjusted "equal pay" data—expose a lack of female/minority representation in higher-paying jobs, and less women/minorities in leadership***. This new level of transparency sought by U.S. investors is in line with the disclosures mandated in the United Kingdom, and provides investors with a baseline to understand broad pay equity at portfolio companies. That is, the difference between what men make and what women make, and what minorities and non-minorities make on a median, unadjusted basis. . . .

***It is also critical to look also at the intersection of race and ethnicity. For African American, Native, and Latina women, the career earnings gap is close to $1 million dollars***. Indeed, the weekly median earnings for African American and Latina women are 62 percent and 54 percent of that of their male peers, respectively. At the current rate of change in the U.S., women will not reach pay parity until 2059, while African American women will have to wait till 2130, and Latina women till 2224.[30]

136.   In their efforts to avoid detailed disclosures that would shed light of the true extent of pay inequity at Qualcomm afflicting African Americans and minorities, the Director Defendants continue to refuse to publish the unadjusted median gender/racial pay disclosures which are industry best practices and standards.

137.   In addition to improperly claiming that the diversity statistics were trade secrets, Qualcomm refused to publish annual diversity reports,

---

[30] *Id.*

SHAREHOLDER DERIVATIVE COMPLAINT

1 thus enabling the Company to attempt to hide the lack of diversity. The
2 Director Defendants were aware of this and were complicit in these acts,
3 thus demonstrating their scienter about Qualcomm's failure to ensure
4 diversity and failure to pay minorities equal pay.

5 **H.  The Director Defendants Have Breached Their Duties by
    Continually Re-Hiring PriceWaterhouseCoopers LLP as the**
6 **Company's Auditor, Despite Its Failure to Do Its Job**

7 138.  PWC is the Company's auditor, and has been so since the
8 Company's founding in 1985 — 35 years and counting.

9 139.  As Qualcomm's Proxy Statement from 2020 disclosed, the
10 following table sets forth the approximate aggregate fees billed to
11 Qualcomm by PWC for fiscal 2018 and fiscal 2019:

| | Fiscal 2019 | Fiscal 2018 |
|---|---|---|
| Audit fees (1) | $ 10,726,000 | $ 11,552,000 |
| Audit-related fees (2) | 1,921,000 | 1,742,000 |
| Tax fees (3) | 463,000 | 1,155,000 |
| All other fees (4) | 13,000 | 42,000 |
| Total | $ 13,123,000 | $ 14,491,000 |

19 140.  Despite billing Qualcomm over $10 million in fees in both 2018
20 and 2019, PWC has completely failed to properly audit and assess the
    Company's internal controls.

21 141.  Defendants Fields, Henderson, Miller, and Vinciquerra as the
22 members of Qualcomm's Audit Committee, are responsible for selecting
23 and monitoring PWC.

24 142.  PWC has served as Qualcomm's auditor *since 1985*, giving rise
25 to a cozy and clubby relationship between PWC and Qualcomm which is
26 not conducive to effective auditing. The Company's compliance with its
27 stated policies regarding diversity and inclusion have been severely

28

SHAREHOLDER DERIVATIVE COMPLAINT

deficient and inadequate.

143.   The very purpose of an auditor is to assess the Company's internal controls and to determine if they are functioning effectively.  Rather than doing so, PWC has wrongfully and consistently given Qualcomm's internal controls a clean bill of health and has failed to point out the obvious — that Qualcomm lacks an effective system of internal controls to ensure that the Company is not discriminating against minorities and is complying with its stated goals and initiatives regarding the promotion of diversity and the avoidance of discrimination and harassment.

144.   Defendants Fields, Henderson, Miller, and Vinciquerra, as the members of the Audit Committee, breached their fiduciary duties by failing to perform their duties on the Audit Committee, including failure to ensure that an adequate audit was being performed of the Company's internal controls regarding diversity, anti-discrimination, anti-harassment, pay equity, and other relevant areas of critical importance to the Company. They also signed the Proxy Statements which contained false statements regarding the Company's internal controls being effective and adequate, which were false and gave a very misleading and inaccurate portrayal of these key issues to stockholders.

## I.   The Unjust Compensation Awarded to Defendant Mollenkopf

145.   Defendant Mollenkopf received unjust compensation and/or compensation and payments that were higher due to Defendants' wrongdoing and because the Company was more profitable by paying blacks and minorities less.

146.   Much of the information about the exact amount of the unjust payments is not publicly available, and has been fraudulently concealed by Defendants.  As a result, Plaintiff requires discovery in order to properly

SHAREHOLDER DERIVATIVE COMPLAINT

allege the full extent and details of Defendants' wrongdoing.

147.   However, at a minimum, based on publicly available information, Defendant Mollenkopf has received substantial unjust compensation during the time the wrongdoing has occurred and persisted.

148.   Defendant Mollenkopf's receipt of this compensation during the relevant time period was unjust in light of his direct participation in the wrongful conduct alleged herein, which constituted bad faith and disloyal conduct.   Defendant Mollenkopf's receipt of such compensation while knowingly or recklessly breaching his fiduciary duties to the Company constitutes unjust compensation that should be recouped by Qualcomm.

149.   The following table provides some additional information about some of Defendant Mollenkopf's compensation during part of the relevant time period:

| Name and Principal Position | Year | Salary ($) (2) | Bonus ($) (3) | Stock Awards ($) (4) | Option Awards ($) (5) | Non-Equity Incentive Plan Compensation ($) (6) | All Other Compensation ($) (7) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| Steve Mollenkopf | 2019 | 1,198,709 | — | 21,600,213 | — | — | 266,130 | 23,065,052 |
| Chief Executive Officer | 2018 | 1,390,739 | — | 10,000,072 | 6,003,095 | 2,260,000 | 321,566 | 19,975,472 |
| | 2017 | 1,156,079 | — | 8,000,035 | — | 2,260,000 | 175,196 | 11,591,310 |

150.   As discussed *supra*, the inequitable compensation awarded to Mollenkopf by Defendants Alexander, Manwani, McLaughlin, and Rosenfeld was so egregious that BlackRock, the Company's second-largest shareholder, objected to the compensation and voted against the "say on pay" executive compensation proposal in the Company's 2020 Proxy Statement.   *See* Attracta Mooney, "*BlackRock Rebels Over Executive Pay at Qualcomm*," THE FINANCIAL TIMES, Mar. 11, 2020.

151. Defendant Mollenkopf's compensation during the relevant period was also unjust because it significantly exceeded the average

SHAREHOLDER DERIVATIVE COMPLAINT

employees' pay, as disclosed by the Company in its 2020 Proxy:

For fiscal 2019, our last completed fiscal year:

- **the annual compensation of our CEO**, as reported in the Summary Compensation Table included on page 59 of this proxy statement, **was $23,065,052**;

- the annual total compensation of our median employee was $90,259; and

- **the resulting ratio was 256 : 1**.

152.   If Defendant Mollenkopf's 2020 pay was more than 256 times the average employees' compensation, then it was an even higher multiple of the median pay of Black and minority employees if Qualcomm paid such employees less than other employees for similar jobs.

153.   When viewed in light of these facts, Defendant Mollenkopf's compensation was unjust under equitable principles.

154.   Defendant Mollenkopf's compensation detailed herein was unjust and should be disgorged or returned by him because he acted in bad faith and in a disloyal manner by virtue of the conduct alleged in this complaint.

## VII.   THE COMPANY HAS SUFFERED SIGNIFICANT DAMAGES

155.   The Company has suffered significant harm and damages due to Defendants' wrongdoing and breaches of duties.

156.   As a direct and proximate result of the Individual Defendants' conduct, the Company has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to, the amounts paid to outside lawyers, accountants, and investigators in connection with internal and external investigations into issues pertaining to the lack of diversity at Qualcomm, discrimination lawsuits, harassment claims, wrongful termination lawsuits, and lack of pay equity claims.

56

157. Moreover, Qualcomm's reputation, goodwill, and market capitalization have been harmed as a result of the Individual Defendants' misconduct.

158. Further, as a direct and proximate result of the Individual Defendants' actions, Qualcomm has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a)    costs incurred from having to hire new employees, as employees have quit in protest over Defendants' misconduct and the discriminatory practices employed by Qualcomm;

(b)    costs incurred from defending and paying settlements in discrimination lawsuits, since the Individual Defendants' wrongdoing caused discrimination to proliferate at Qualcomm;

(c)    loss of reputation; and

(d)    costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Qualcomm.

## VIII.  DEMAND FUTILITY

159. Plaintiff brings this action derivatively in the right and for the benefit of Qualcomm to redress injuries suffered, and to be suffered, by Qualcomm and its stockholders as a direct result of the Defendants' violations of federal securities laws and breaches of fiduciary duty.

160. Qualcomm is named as a nominal defendant solely in a derivative capacity.

161. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

162. At the time this action was commenced, Qualcomm's Board consisted of the following 11 members: Defendants Mollenkopf, McLaughlin, Fields, Henderson, Livermore, Manwani, Miller, Randt, Rosenfeld, Smit, and Vinciquerra.

57

163.   Plaintiff has not made any demand on Qualcomm to institute this action because such a demand would be a futile, wasteful, and useless act.

164.   Under Delaware law, demand is futile if a majority of the directors are either interested in or not independent of a person interested in the claims asserted.   Further, where a board is made up of an even number of directors, a majority of directors is considered to be half the Board.

165.   Based on these principles, demand is futile here if six (6) of the eleven (11) directors are either interested in or not independent of a person interested in the claims asserted herein.

### A.   Demand on the Board is Excused as Futile

166.   The challenged misconduct at the heart of this case involves the direct facilitation of illegal activity, including the Board knowingly and/or consciously presiding over the Company's discrimination against Blacks and minorities at Qualcomm.   In their capacity as corporate directors, the Board members affirmatively adopted, implemented, and/or condoned a business strategy based on Qualcomm's deliberate and widespread violations of law. The Board members cannot plausibly claim ignorance concerning these wide-ranging compliance failures. Indeed, the Board was specifically and uniquely accountable and responsible for the compliance failures discussed herein given that the Board was repeatedly made aware of the Company's failed internal controls and failure to comply with regulations.

167.   Indeed, the lack of diversity challenged by this lawsuit pertains to the Board itself, which does not contain a single African American individual.  The Governance Committee charter states that:

SHAREHOLDER DERIVATIVE COMPLAINT

*As part of its efforts to create a diverse Board, including with respect to race, ethnicity and gender, the Governance Committee will include, and instruct any search firm it engages to include, women and racially/ethnically diverse candidates in the pool from which the Governance Committee selects director nominees.[31]*

168. Defendants Mollenkopf, McLaughlin, Fields, Henderson, Livermore, Manwani, Miller, Randt, Rosenfeld, Smit, and Vinciquerra thus all knew that the Company's search firms *were required to include "racially and ethnically diverse candidates* in the pool from which the Governance Committee selects director nominees."

169. Despite having actual knowledge of this requirement, Defendants Mollenkopf, McLaughlin, Fields, Henderson, Livermore, Manwani, Miller, Randt, Rosenfeld, Smit, and Vinciquerra all knew that, year after year, Qualcomm did not choose any racially or ethnically diverse candidates to be Board members.

170. Rather than undertake their duty to investigate all complaints and concerns related to the Company's financial reporting and internal controls, the Board undertook minimal action. This essential "do nothing" strategy in the face of information evidencing the systematic violations of applicable laws and regulations is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment. A derivative claim to recoup damages for harm caused to the Company by pervasive unlawful activity represents a challenge to conduct

---

[31] *See* Qualcomm's Corporate Governance Principles and Practices, available at https://d1io3yog0oux5.cloudfront.net/_cf13d56813c1ec7af0aeb3f038c77a4e/qualcomm/db/720/6495/file/QCOM_+MASTER+Corporate+Governance+Principles+and+Practices_Proposed+Updates_050320_Clean.pdf, last visited July 13, 2020.

SHAREHOLDER DERIVATIVE COMPLAINT

that is outside the scope of appropriate business judgment – conduct for which the Individual Defendants should face potential personal liability. As such, the protections of the "business judgment rule" do not extend to such malfeasance. Nor can such malfeasance ever involve the "good faith" exercise of directorial authority. Accordingly, any demand on the Board to initiate this action would be futile.

### B. Demand Is Excused Because a Majority of the Director Defendants is Either Not Independent or is Conflicted Because These Defendants Face a Substantial Likelihood of Liability Arising From Their Misconduct

171. Even if knowingly presiding over illegal conduct somehow falls within the ambit of the business judgment rule (which it does not), demand is also futile and excused because a majority of the members of the Board are not disinterested or independent and cannot, therefore, properly consider any demand.

172. As an initial matter, the Board has conceded in the Company's SEC filings, including its January 23, 2020 proxy statement, that Mollenkopf is not an independent director of the Company. Specifically, Mollenkopf is not independent and faces a substantial likelihood of liability because his principal occupation is serving as the Company's Chief Executive Officer. According to the Company's SEC filings, since 2009, Mollenkopf has received in excess of $189,135,171 in salary and other compensation from Qualcomm. Moreover, a significant portion of Mollenkopf's compensation is incentive-based, which means that he was personally incentivized to perpetuate misconduct (such as that described herein) that artificially inflates the performance of the Company. As a Qualcomm executive, he had exposure to and knowledge of the wrongdoing alleged, including any "red flags." Mollenkopf cannot realistically distance himself from the misconduct alleged herein. Mollenkopf is therefore incapable of impartially considering

SHAREHOLDER DERIVATIVE COMPLAINT

1   a demand to commence this action.

2   173. Furthermore, Defendants Fields, Henderson, Smit and
3   Vinciquerra have all been members of the Audit Committee during the
4   relevant period, and are conflicted from considering a demand because they
5   each face a substantial likelihood of liability as a result of their conduct on
6   the committee. The Audit Committee's charter imposes specific duties on
7   members of this committee to, among other things, "review and approve
8   the Company's Code of Ethics and provide for and review prompt
9   disclosure to the public of any change in, or waiver of such Code of Ethics."

10  174. In accordance with its charter, the Audit Committee also
11  reviews the Company's policies and practices with respect to the financial
12  reporting and control aspects of risk management, and must review the
13  status of risk oversight activities performed by the Board and its other
14  committees.

15  175. As members of the Audit Committee, Defendants Fields,
16  Henderson, Smit and Vinciquerra violated their fiduciary duties to act in
17  good faith to address the pervasive legal violations discussed herein,
18  including the unlawful discrimination. Accordingly, Defendants Fields,
19  Henderson, Smit and Vinciquerra face a substantial likelihood of liability
20  and cannot impartially consider a demand. Therefore, demand is excused
21  with respect to these defendants.

22  176. Furthermore, the Director Defendants were on the Board during
23  the relevant period, and thus were exposed to and had knowledge of the
24  "red flags" alleged herein regarding unlawful discrimination and failure to
25  abide by the Company's stated policies to promote diversity. The directors'
26  inaction in the face of red flags subjects them to a substantial likelihood of
27  liability for their conduct and, therefore, demand is excused.

28

SHAREHOLDER DERIVATIVE COMPLAINT

177.   The Board is likewise conflicted from and unable to pursue Qualcomm's claims against members of the Company's management, including Defendant Mollenkopf. Any effort to prosecute such claims against these Defendants for their direct roles in implementing a business strategy designed to ignore or otherwise circumvent federal and state laws prohibiting discrimination would necessarily expose the Board's own culpability for the very same conduct. In other words, given that the Board had been on notice of the wrongdoing, any effort by the Board to hold Defendant Mollenkopf liable would surely lead these executives to defend on the ground that their own conduct was consistent with Qualcomm's corporate policy and practice, as established by and known to the Board.

**C.    The Entire Board Faces a Substantial Likelihood of Liability for Failure to Discharge Their Oversight Obligations in Good Faith**

178.    Under Delaware law and Qualcomm's Corporate Governance Principles, the Board, as the Company's highest decision-making body, is charged with ensuring that processes are in place for ensuring legal and regulatory compliance. This is particularly true when such compliance concerns a core operation of the Company such as its employment practices. Here, the misconduct alleged was pervasive, took place over many years, and involved the Company's core business operations since the employment practices affected all Company operations. Organized and long-running violations of the law do not result from an isolated failure of oversight. The entire Board was obligated to oversee the Company's risk, including potential liability for Qualcomm's violations of federal and state laws regarding discrimination. At the very least, the Director Defendants consciously turned a blind eye to these pervasive violations of law, creating a substantial likelihood of liability. Accordingly, demand is excused.

SHAREHOLDER DERIVATIVE COMPLAINT

179.   All of the Board's directors, at the time this action was initiated, failed to act in the face of known duties. Indeed, as explained herein, they were presented with – but consciously ignored (and/or perpetuated) – substantial "red flag" warnings that Qualcomm was discriminating against Blacks and other minorities with respect to hiring, promotion, and evaluation of Board candidates.  The Board also knew that the Company's workforce has consistently only had 1.5% African American workers.  The Board was also aware of other systematic discrimination at Qualcomm, such as the fact that in July 2016, Qualcomm was forced to pay $19.5 million to settle a class action lawsuit which alleged that Qualcomm systematically discriminated against approximately 3,300 women by paying them less than men holding the same or equivalent positions.

180.   These and other wrongful acts have caused and will continue to cause the Company to be subjected to significant potential fines and penalties and numerous lawsuits. They have also resulted in severe harm to the Company's business reputation. Since the wrongdoing and harm alleged in this Complaint flows directly from the Board's conscious decision to permit the sustained and systemic violations of law in question, the Director Defendants are incapable of exercising the independent judgment required to determine whether the initiation of an action against the Defendants is appropriate.

## IX.    CAUSES OF ACTION

**COUNT I**

**Breach of Fiduciary Duty**

**Against All Individual Defendants and Does 1–30**

181.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

SHAREHOLDER DERIVATIVE COMPLAINT

182.   The Individual Defendants and Does 1–30 owed and owe the Company fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

183.   The Individual Defendants and Does 1–30, and each of them, as a result of the facts alleged herein, violated and breached their fiduciary duties of candor, good faith, and loyalty.

184.   As a direct and proximate result of the Individual Defendants' and Does 1–30's breaches of their fiduciary obligations, the Company has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

## COUNT II
### Aiding and Abetting Breach of Fiduciary Duty
### Against All Individual Defendants and Does 1–30

185.   Plaintiff incorporates by reference and re-alleges each of the preceding paragraphs as if fully set forth herein.

186.   Each of the Individual Defendants aided and abetted the other Individual Defendants in breaching their fiduciary duties owed to the Company.

187.   The Individual Defendants owed the Company certain fiduciary duties as fully set out herein.  By committing the acts alleged herein, the Individual Defendants breached their fiduciary duties owed to the Company.

188.   Each of the Individual Defendants colluded in or aided and abetted the other Individual Defendants' breaches of fiduciary duties, and actively and knowingly participated in the other Individual Defendants' breaches of fiduciary duties.  Each of the Individual Defendants knew about

64

SHAREHOLDER DERIVATIVE COMPLAINT

or recklessly disregarded the other Individual Defendants' breaches of fiduciary duty, which were and are continuing, as set forth in particularity herein.

189.   The Company was injured as a direct and proximate result of the aforementioned acts.

**COUNT III**
**Abuse of Control**
**Against all Defendants**

190.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

191.   By virtue of their positions and financial holdings at Qualcomm, the Director Defendants exercised control over Qualcomm and its operations, and owed duties as controlling persons to Qualcomm not to use their positions of control for their own personal interests and contrary to Qualcomm's interests.

192.   Defendants' conduct alleged herein constitutes an abuse of their ability to control and influence the Company, for which they are legally responsible.

193.   As a result of Defendants' abuse of control, the Company has sustained and will continue to sustain damages and injuries for which it has no adequate remedy at law.

**COUNT IV**
**Unjust Enrichment**
**Against All Individual Defendants and Does 1–30**

194.   Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

195.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the

SHAREHOLDER DERIVATIVE COMPLAINT

Company.

196.   During the Relevant Period, the Individual Defendants either received annual stipends, bonuses, stock options, or similar compensation from the Company that was tied to the financial performance of the Company or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

197.   Plaintiff, as shareholder and representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

198.   Plaintiff, on behalf of the Company, has no adequate remedy at law.

**COUNT V**

**Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9
Against All Individual Defendants**

199.   Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein, except to the extent those allegations plead knowing or reckless conduct by Defendants.  This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of Defendants.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to this claim.

200.   SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any

66

statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

201. Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders that were contained in the 2019 and 2020 Proxy Statements. The Proxy Statements contained proposals to the Company's stockholders urging them to reelect the members of the Board, to approve "say on pay" executive compensation proposals, and to rehire PWC as the Company's auditor. The 2019 and 2020 Proxy Statements, however, misstated or failed to disclose the following information, among others:

(a)    That deficiencies in the Company's internal and disclosure controls were known to the Board when the Proxy Statements were filed;

(b)    That the Company was not, through its diversity and inclusion programs, achieving results that were "*measurable and produce actionable tasks*" and was in fact discriminating against Black and minority individuals with respect to hiring, promotion, and pay;

(c)    That the statement in the 2020 Proxy that "***the Governance Committee will include, and instruct any search firm it engages to include, women and racially/ethnically diverse candidates in the pool from which the Governance Committee selects director nominees***" was misleading because it suggested that the Company was actively seeking to achieve

SHAREHOLDER DERIVATIVE COMPLAINT

racial and ethnic diversity in its Board membership, while the undisclosed reality is that Qualcomm may have a policy of attempting to include racially and ethnically diverse candidates in its director nominee pool, but it either has no intention to actually nominate such persons to its Board or it engages in efforts to thwart the nomination of such persons and prefers non-diverse applicants in the pool;

(d)   That the Company does not have term limits due to a desire to retain the experience of the incumbent Director Defendants, but instead to keep minorities off the Board;

(e)   That the Company's refusal to disclose its median salary and pay/employment data in an annual report is due to a desire to conceal existing, known pay disparity at the Company which adversely affects women and minorities;

(f)   That the Company's executive compensation decisions do not take into consideration in any way the executives' success or lack thereof in achieving the Company's diversity and inclusion goals; moreover, that the Company's stated policies with respect to diversity and anti-discrimination were not effective and were not being complied with;

(g)   That the Board's Governance Committee did not take racial and ethnic diversity into consideration when nominating Board candidates, as opposed to including persons in the pool of potential nominees, and instead simply sought to create a false appearance of seeking diversity among potential Board candidates;

SHAREHOLDER DERIVATIVE COMPLAINT

(h)   That Defendants' had knowledge that the Company's internal controls and systems were inadequate and ineffective to protect minorities against discrimination in hiring, promotion, and other critical terms of employment and equal access;

(i)   That Defendants failed to maintain appropriate policies, internal controls, and procedures to ensure that the Company's stated policies with respect to diversity and anti-discrimination were being complied with;

(j)   That the Company's diversity and inclusion programs were not achieving measurable and actionable results, and needed substantial improvement; and

(k)   That, as a result, the Company was at substantial risk of large monetary fines, penalties, and adverse judgments from lawsuits due to the fact that the Company was not in compliance with federal and state laws regarding hiring, promotion, and pay practices.

202.   By reasons of the conduct alleged herein, Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. As a direct and proximate result of Defendants' wrongful conduct, the Company misled or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding the Company's recommendation to reelect the current Board, vote in favor of executive compensation proposals, and rehire PWC.

203.   Plaintiff, on behalf of the Company, seeks injunctive and equitable relief because the conduct of the Individual Defendants interfered with Plaintiff's voting rights and choices at the 2019 and 2020 annual

SHAREHOLDER DERIVATIVE COMPLAINT

1   meetings.  Plaintiff does not seek any monetary damages for the proxy law
2   violations.

3        204.   This action was timely commenced within three years of the
4   date of the 2019 and 2020 Proxy Statements and within one year from the
5   time Plaintiff discovered or reasonably could have discovered the facts on
6   which this claim is based.

7   **X.    PRAYER FOR RELIEF**

8        WHEREFORE, Plaintiff, on behalf of the Company, requests
9   judgment and relief as follows:

10       A.    Against all of the Defendants, jointly and severally, and in
11   favor of the Company for the amount of damages sustained by the
12   Company along with pre- and post-judgment interest as allowed by law
13   resulting from Defendants' breaches of fiduciary duty;

14       B.    Directing the Company to take all necessary actions to reform
15   and improve its corporate governance and internal procedures to comply
16   with applicable laws and to protect the Company and its shareholders
17   from a repeat of the damaging events described herein, including, but not
18   limited to, putting forward for shareholder vote, resolutions for
19   amendments to the Company's By-Laws or Articles of Incorporation and
20   taking such other action as may be necessary to place before shareholders
21   for a vote of the following Corporate Governance Policies:

22            (1)    a proposal to require at least three current Directors
23        to resign from the Board and setting forth a resolution to replace
24        such Directors with two Black persons and one other minority;

25            (2)    a proposal to replace Steve Mollenkopf as CEO with
26        a non-executive director who is independent;

27

28

SHAREHOLDER DERIVATIVE COMPLAINT

(3)     all Director Defendants named in this suit should return all their 2020 compensation received from Qualcomm (including any stock grants), and donate the money to an acceptable charity or organization whose efforts include the advancement of blacks and minorities in corporate America;

(4)     publication of an annual Diversity Report that contains particularized information and the hiring, advancement, promotion, and pay equity of all minorities at Qualcomm;

(5)     creation of a $800 million fund to hire Black and minority employees, promote them to more management positions at the Company, establish and maintain a mentorship program at Qualcomm for Black and minority people that is committed to providing the skills and mentorship necessary to succeed in corporate America;

(6)     requirement of annual training of Qualcomm's entire Board and all Section 16 executive officers, which training should at a minimum focus on diversity, affirmative action, anti-discrimination and anti-harassment, and other relevant topics.

(7)     immediately setting specific goals with respect to the number of Blacks and minority employees to hire at the Company over the next five years, and Qualcomm should adopt a revised executive compensation program that makes 30% of executives' compensation tied to the achievement of the diversity goals.

(8)     replacement of PWC as its auditor.  Qualcomm is one of PWC's largest customers, and PWC has continuously

SHAREHOLDER DERIVATIVE COMPLAINT

served as Qualcomm's auditor *since the Company was founded in 1985*, giving rise to a cozy and clubby relationship between PWC and Qualcomm which is not conducive to effective auditing.  The Company's compliance with its stated policies concerning the alleged commitment to diversity has been abysmal to the point of being basically non-existent.  The very purpose of an auditor is to assess the Company's internal controls and determining if they are functioning effectively.  Rather than doing so, PWC has wrongfully and consistently given Qualcomm's internal controls a clean bill of health and has failed to point out the obvious — that the Company lacks an effective system of internal controls to ensure that the Company is not discriminating against minorities and is complying with its stated goals and initiatives regarding the promotion of diversity and the avoidance of discrimination and harassment.

(8)   a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater non-controlling shareholder input into the policies and guidelines of the Board;

(9)   a proposal to strengthen Qualcomm's oversight of its procedures regarding the termination of employees, executives, and Board members accused of discrimination;

(10)   a proposal to strengthen internal controls concerning discrimination;

(11)   a proposal to eliminate the use of Non-Disclosure Agreements at the Company so that current and former employees can report any and all instances of suspected

72

discrimination without threat of legal action;

(12) a proposal to eliminate the use of mandatory arbitration for employee disputes and claims of wrongful termination and discrimination;

(13) a proposal requiring one vote for each share held, and eliminating the current use of a dual class structure affording more than one vote per share; and

(14) a provision to permit the non-management shareholders of Qualcomm to nominate at least three candidates for election to the Board;

C.    Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of Qualcomm has an effective remedy;

D.    Awarding to Qualcomm restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by Defendants;

E.    Awarding punitive damages at the maximum amount permitted by law;

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' fees, experts' fees, costs, and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

SHAREHOLDER DERIVATIVE COMPLAINT

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of Qualcomm, hereby demands a trial by jury of all issues that are subject to adjudication by a trier of fact.

Dated:  July 17, 2020

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Anne Beste (SBN 326881)

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone: (858) 914-2001
Facsimile:   (858) 914-2002
Email: fbottini@bottinilaw.com
          achang@bottinilaw.com
          abeste@bottinilaw.com

*Counsel for Plaintiff Becky Kiger*

74

SHAREHOLDER DERIVATIVE COMPLAINT

# VERIFICATION

I, Becky Kiger, verify that I am a shareholder of Qualcomm Incorporated.  I have reviewed the allegations in this Verified Shareholder Derivative Complaint.  As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true.  Having received a copy of the complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 17, 2020.

Becky Kiger